**UNITED STATES of America,**
**Appellee,**

v.

**Luis TOM, a/k/a Cuba, Defendant,**
**Appellant.**

**No. 99–2279.**

United States Court of Appeals,
First Circuit.

Heard Jan. 8, 2003.

Decided June 3, 2003.

Martin D. Boudreau, for appellant.

Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL and STAHL, Senior Circuit Judges.

TORRUELLA, Circuit Judge.

Defendant-appellant Luis Tom, also known as "Cuba," was convicted by jury of conspiring to possess cocaine base with intent to distribute, possessing cocaine base, distributing cocaine base, and aiding and abetting the possession and distribution of cocaine base. Tom was sentenced to seventy-eight months on each count, to run concurrently, and ordered to pay a $200 special assessment. He now appeals, arguing that (1) he should have been acquitted under an entrapment defense; (2) the jury instruction on entrapment was erroneous; (3) the district court made two evidentiary errors; and (4) the district court erred in failing to grant an adjustment for a minor role in the offense and

refusing to grant a downward departure for overestimated criminal history. After careful consideration of each issue, we affirm the conviction and sentencing.

## I. Background

In 1998, agents and officers of the Drug Enforcement Administration ("DEA"), the Worcester Police Department, the Massachusetts State Police, and the United States Marshals Service began an investigation into drug trafficking, particularly trafficking in cocaine base, or "crack," that initially focused on the Quisqueya nightclub on Main Street in Worcester, Massachusetts. As part of that investigation, DEA Special Agent Michael Pevarnik directed the cooperating witness John Quezada, an individual who had previously worked with the DEA on approximately 30 cases and who spoke both English and Spanish, to become a "regular" at the Quisqueya nightclub. Quezada began frequenting Quisqueya, calling Pevarnik after each visit.

On July 11, 1998, Quezada went to Quisqueya, where he overheard a woman named "Wanda" tell Tom that she was waiting for heroin that had not arrived yet. Later that evening, Quezada talked to Tom, whom he had not known previously, and informed him of his need for "a good connection" for heroin and crack cocaine. Tom replied that he had connections in Miami and New York, and gave Quezada his telephone number.

Shortly thereafter, Quezada called Tom to inquire about purchasing one ounce of crack cocaine. Tom agreed to try to find Quezada some crack cocaine. In a recorded conversation on July 15, 1998, Tom told Quezada that he was trying to arrange for Quezada to purchase the crack cocaine from a "white guy" who had 90% pure crack cocaine that he would sell for $300. Tom also said that his partner was going to New York, and that he, Tom, was "thinking of doing this business directly with you." When Quezada said that he was looking for someone to continue dealing with in the future, Tom told Quezada that he did not "like that scene." He added, "What I like is grass." But Tom also said that he would make the connection for Quezada, and the deal would be "[j]ust between you and me." At the end of their conversation, Tom told Quezada to call him the following day.

On July 16, 1998, in another recorded telephone conversation, Tom told Quezada that the supplier had nearly three ounces of crack cocaine available. Tom wanted Quezada to talk to the supplier to see if the cocaine was to his liking.

Quezada went to the Quisqueya Club the next day, and encountered Tom there. Tom quoted him three different prices— $650, $800, and $1300 per ounce, depending on the quality—for the crack cocaine. Tom also told Quezada that he could supply Quezada with heroin and promised to contact Quezada later.

On July 21, 1998, Tom called Quezada to discuss the crack transaction further. In a recorded conversation, Tom told Quezada that he had not yet settled on a price with the crack supplier, but that he was to talk to the supplier the next day and then call Quezada. The next day, Quezada was supposed to meet Tom to purchase the crack, but the transaction did not occur because Tom's supplier had been arrested.

Tom arranged an alternate transaction with Jarrot Carter, or "Blunt," for the purchase of one ounce of crack cocaine for $800. Quezada made this purchase, and three others, from Carter.

Based on the foregoing information, Tom was tried and convicted by jury verdict on all counts, sentenced by the court to seventy-eight months on each count—to

run concurrently—and ordered to pay a $200 special assessment. This appeal followed.

## II. Discussion

### A. Entrapment

This Court reviews "de novo [Tom]'s claim that the district court should have granted his motion for judgment of acquittal because he was entrapped as a matter of law." *United States v. LaFreniere*, 236 F.3d 41, 45 (1st Cir.2001). We review the evidence in the light most favorable to the prosecution to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

■■■ The entrapment defense involves "two elements: (1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." *United States v. Rodríguez*, 858 F.2d 809, 812 (1st Cir.1988) (citing *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)). Once a defendant has made a sufficient threshold showing to raise the question of entrapment, the burden shifts to the government to prove beyond a reasonable doubt either that there was no inducement or that the defendant was predisposed to commit the offense. *Rodríguez*, 858 F.2d at 815.

■■■ As to the inducement prong of the defense, the evidence demonstrates that Quezada did not improperly induce Tom to engage in crack cocaine trafficking.

"Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the [g]overnment may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (citing *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 77 L.Ed. 413 (1932)). It is undisputed that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells*, 287 U.S. at 441, 53 S.Ct. 210; *LaFreniere*, 236 F.3d at 46. Quezada initially approached Tom for a heroin and crack cocaine "connection" and called Tom several times over the course of two weeks, but this does not establish the dogged pressure characteristic of inducement. *See United States v. Tejeda*, 974 F.2d 210, 218 (1st Cir.1992) (indicating that informant's actions initiating most of calls and "diligently pursu[ing]" drug transaction does not establish "persistent badgering" or inducement). Tom did not return most of Quezada's calls, a fact which suggests he felt neither compelled nor pressured to contact Quezada. Further, Tom did not ask Quezada to stop calling. *See United States v. Acosta*, 67 F.3d 334, 338 (1st Cir.1995) (where defendant did not make explicit request to be let alone, jury decision that there was no inducement was reasonable). Here, the government simply provided an opportunity for Tom to engage in a drug conspiracy but did not engage in any prohibited coercion to encourage him to do so.[1] Taken

---

1. In *United States v. Gendron*, 18 F.3d 955 (1st Cir.1994), we provided several examples of improper conduct rising to the level of inducement, including where government agents:

 (1) used "intimidation" and "threats" against a defendant's family; (2) called every day, "began threatening" the defendant, and were belligerent; (3) engaged in a

"forceful" solicitation and "dogged" insistence until [defendant] "capitulated"; (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms; (5) played upon sentiment on "one former war buddy ... for another" to get liquor (during prohibition); (6) used "repeated suggestions which succeeded only when defendant had lost his

together, this evidence proved beyond a reasonable doubt that the government did not improperly induce Tom to commit crime.

■ There was also substantial evidence to support a finding that Tom was predisposed to deal in crack cocaine. Predisposition can be shown where a defendant "promptly avail[s]" himself of a government-provided opportunity to commit a crime. *Jacobson,* 503 U.S. at 549, 112 S.Ct. 1535. In this case, it is clear that Tom was predisposed to deal drugs because he immediately responded to Quezada's request for a "good connection" by giving him his phone number and informing him that he had the necessary connections. Within two weeks, Tom had introduced Quezada to multiple dealers and indeed a drug transaction was consummated. *Cf. United States v. Vega,* 102 F.3d 1301, 1307 (1st Cir.1996) (finding defendant was predisposed where he "supplied [the DEA special agent] with narcotics within one hour of their first encounter").

This Court has held that predisposition is evaluated by considering "how the defendant likely would have reacted to an ordinary opportunity to commit the crime." *Gendron,* 18 F.3d at 962. Factors to be weighed in making this determination include "(1) [defendant]'s character or reputation; (2) whether the initial suggestion to commit the crime was made by the government; (3) whether [defendant] was engaged in criminal activity for profit; (4) whether he showed reluctance to commit the offense, which was overcome by governmental persuasion; and (5) the nature of such persuasion or inducement." *LaFreniere,* 236 F.3d at 46. In spite of

Tom's claimed reputation as a hard-working family man, he clearly had knowledge of and experience in the drug market. *See Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967) ("It cannot be enough ... where the defendant readily agreed to engage in a criminal act, to show that he enjoys a good reputation."). Although Quezada approached Tom about needing to find a crack and heroin supplier, Tom showed no reluctance to help and needed no persuasion to assist Quezada in procuring the drugs. Indeed, Tom replied that he had connections in Miami and New York and furnished his own telephone number, strongly implying that he was open to further dealings. Ready agreement to commit a crime can "adequately evince an individual's predisposition." *United States v. Gifford,* 17 F.3d 462, 469 (1st Cir.1994). Finally, we have already discussed the government's actions and found they did not constitute improper inducement.

■ Further, evidence of predisposition may be inferred from conversations in which a defendant displays knowledge or experience in the criminal activity under investigation. *Tejeda,* 974 F.2d at 218 (highlighting evidence of familiarity with "drug trade lingo" and knowledge of the going rate of cocaine); *United States v. Panet–Collazo,* 960 F.2d 256, 259–260 (1st Cir.1992) (noting tape-recorded conversations in which, inter alia, defendant bragged that he had "worked with cocaine a lot"). Here, Tom's discussion of the virtues of pure crack versus crack that has been "cut," and his attestations to the quality of Carter's crack cocaine evidences his familiarity with the drug trade. Moreover, during Quezada's first meeting with

job and needed money for his family's food and rent"; (7) told defendant that she (the agent) was suicidal and in desperate need of money.

*Id.* at 961–62 (internal citations omitted). None of these overly coercive tactics were employed by the government in this case.

Carter, Carter told Quezada that Tom had been "deal[ing] with me for years, man." Tom's comments about Carter in that same conversation confirmed that his relationship with Carter was not new.

Considering the body of evidence available regarding Tom's willingness to participate in the drug trade and the obviousness of his previous engagement in such business along with the permissible actions taken by the government to provide the opportunity to commit the crime, we find the district court did not err in permitting the government's case against Tom to go to the jury.

### B. Jury Instructions

 Tom also challenges the jury instructions regarding entrapment. Where the alleged error involves the instructions' adequacy in explaining the law, this Court reviews jury instructions de novo. *United States v. Woodward,* 149 F.3d 46, 65 (1st Cir.1998). Challenges to the form or wording of an instruction are reviewed under the abuse of discretion standard. *Id.* at 69 n. 14. In either case, this Court conducts its review by looking at the entire charge, in light of the evidence, and "determin[ing] whether, taken as a whole, the court's instructions fairly and adequately submitted the issues in the case to the jury." *Id.* at 69 (internal quotations and citations omitted).

Tom first argues that the instructions [2] did not allow the jury to find that he was induced to commit the crime because he was unfairly persuaded to introduce Quezada to Carter. Improper inducement consists of "an 'opportunity' plus something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative non-criminal type motive." *Gendron,* 18 F.3d at 961 (emphasis omitted). The district court's instruction placed the issue of persuasion before the jury through its instruction that "inducement refers to government conduct which

**2.** The relevant portions of the jury instructions were as follows:

A person is entrapped when he is induced or persuaded by law enforcement officers or their agents to commit a crime that he was not otherwise ready and willing to commit. The law forbids his conviction in such a case. However, if the defendant was ready and willing to violate the law and the government merely presented him with an opportunity to do so that would not constitute entrapment.

. . . .

An entrapment offense, thus, involves two elements, both of which must exist in order for the offense to be valid. First, the government inducement of the defendant to engage in criminal conduct, and second, the defendant's lack of a predisposition to engage in the criminal conduct prior to such inducement.

First, in order for there to be improper inducement there must be evidence that a law enforcement official, or his agent, enticed the defendant to engage in criminal activity. Neither mere solicitation or the creation of opportunities to commit an offense constitutes inducement. Rather inducement refers to government conduct which persuades a person to turn from a righteous path to an unlawful one.

In order to rise to the level of improper inducement the request to engage in an unlawful act must contain pressures on the defendant to commit the crime. Pressure can be shown by pleading with a defendant; by incessant demands to participate in a criminal act following repeated refusals to do so; by threats of violence or inherently coercive tactics; or by arm-twisting aimed at exploiting sympathy or friendship. . . .

Second, the defendant must lack the intent or predisposition to commit the crime prior to being approached by government agents. When considering whether Mr. Tom was predisposed to commit the crimes with which he is accused you should focus on whether he was an unwary innocent whom the law is designed to protect, or an unwary criminal who is offered no protection by the entrapment defense.

persuades a person to turn from a righteous path to an unlawful one." In addition, the court explained to the jury that "pressure" could range from pleading to coercion.[3] *See United States v. Terry*, 240 F.3d 65, 69–70 (1st Cir.2001). The instructions adequately presented the law and Tom's theory of the case.

■ Tom also objects to the district court's reference to the "unwary criminal" in its instructions. The phrase "unwary criminal" here was merely intended to focus the jury on whether Tom was predisposed to participate in a drug conspiracy. Courts have frequently used the phrase "unwary criminal" to refer to a person predisposed to commit a particular crime. *See, e.g., Mathews*, 485 U.S. at 63, 108 S.Ct. 883 (indicating predisposition "focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime"); *Sherman v. United States*, 356 U.S. 369, 372–73, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) ("To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal.... On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence."). Use of the phrase in the jury instructions does not contradict current law. Considered as a whole, the dis-

trict court's instruction on entrapment was appropriate and legally accurate.

## C. Evidentiary Issues

■ Tom presents two evidentiary issues on appeal: the admission of hearsay regarding predisposition and an agent's alleged vouching for the credibility of a witness. Evidentiary rulings that are objected to below are reviewed for abuse of discretion. *United States v. Marino*, 277 F.3d 11, 24 (1st Cir.2002). Where Tom did not object to the evidentiary issues during trial, we are limited to plain error review. *See United States v. Woods*, 210 F.3d 70, 78 (1st Cir.2000).

### 1. Hearsay Regarding Predisposition

Tom objects to admission of the following testimony:

Q. And did he [Carter] say, "Yo, he deal with me for year, man. He know, believe me. I wouldn't"—"I wouldn't play games. Yo, call me, call me again. Matter of fact, would you do this? I'm leaving to New York right now, when I drop him off." Do you see that?

A. Yes.

Q. When Blunt [Carter] mentioned "he," did you have an understanding as to who he meant?

A. Yes.

Q. What was your understanding?

Following an overruled objection by Tom, Quezada responded that he understood "he" to mean "Luis [Tom]."

---

**3.** Tom's contention that the instruction on "pressures" prevented the jury from finding entrapment based upon a theory of persuasion is without merit and his reliance on *United States v. Montañez*, 105 F.3d 36, 39–40 (1st Cir.1997), is misplaced. In *Montañez*, the court's instructions contained "examples [that] were all either coercion examples or involved abstractions ('dogged insistence')

rather far from the examples of inducement by an undue appeal to sympathy, which the defendant expressly requested and which were more pertinent to his defense." *Id.* at 39. In contrast, the district court here provided a more comprehensive and relevant array of examples of the type of pressure that might create improper inducement.

Carter's statement occurred during a recorded conversation on July 24, 1998; the recording and transcript of that conversation were admitted at trial without objection. During the above testimony, the government was reading a portion of the admitted transcript. Tom's objection to the admission of Quezada's testimony regarding the statement involves two separate issues. First, Tom seems to be objecting to admission of Carter's statement. Second, Tom appears to question Quezada's ability to testify as to whom Quezada understood Carter to be referring when he made the statement.

We turn first to admission of Carter's statement. To the extent that Tom is claiming that the statement itself or the government's reading of the statement from the admitted transcript is inadmissible hearsay, he is mistaken. First, Tom did not object to the admission of the recording of the conversation of July 24, 1998, nor to the admission of the transcript of that tape recording. He also did not seek a ruling regarding coconspirator statements pursuant to Fed.R.Evid. 801(d)(2)(E) and *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977). Thus, any claim regarding admission of the statement would be subject to plain error review. *See Woods*, 210 F.3d at 78 (plain error review of admission of coconspirator statement where appellant did not object to omission of *Petrozziello* determination at close of evidence).

Under the plain error standard, an appellant must demonstrate that (1) there was an error; (2) the error was plain; and (3) the error affected substantial rights. *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Even once this standard is met, an appellate court may recognize forfeited error only if "the error 'seriously affect[ed] the fairness, integrity or public reputation

of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

 A statement is not hearsay and is therefore admissible if it is offered against a party and is made "by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R.Evid. 801(d)(2)(E). A statement is admissible under Rule 801(d)(2)(E) where the government demonstrates "by a preponderance of the evidence that a conspiracy existed, that the declarant and the defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy." *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir.1980). A statement is in furtherance of the conspiracy if it "tends to advance the objects of the conspiracy as opposed to thwarting its purpose." *United States v. Flores–Rivera*, 56 F.3d 319, 330 (1st Cir.1995) (quoting *United States v. Fahey*, 769 F.2d 829, 839 (1st Cir.1985)).

 We find that Carter's statement was an admissible coconspirator statement under those standards. Carter's recorded statement to Quezada, was during and in furtherance of the drug conspiracy that included both Carter and Tom. Carter made the statement immediately after handing Quezada one ounce of crack cocaine in an attempt to alleviate Quezada's concerns about the quality of the crack. Carter's challenged statement was intended to reassure Quezada and convince him to proceed with the purchase, furthering the conspiracy with Tom to distribute crack cocaine. We need not conduct an independent inquiry into reliability when the evidence falls within a firmly rooted hearsay exception; the coconspirator exception to the hearsay rule is such a firmly rooted exception. *Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct.

2775, 97 L.Ed.2d 144 (1987). Thus, we hold that there was no plain error in the admission of this coconspirator statement.

■ To the extent that Tom's claim is that Quezada was not competent to testify about his understanding of Carter's statement—i.e., to whom Carter was referring when he said that "he deal with me for years"—his claim must also be rejected. Fed.R.Evid. Rule 701 permits opinion testimony by a lay witness where such "opinions or inferences ... are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." *See Lynch v. City of Boston,* 180 F.3d 1, 16 (1st Cir.1999); *see also United States v. Flores,* 63 F.3d 1342, 1359 (5th Cir.1995) (allowing witness to testify to meaning of ambiguous words in tape recorded conversation to which he was a party). The decision regarding "[t]he admissibility of lay opinion testimony pursuant to Rule 701 is committed to the sound discretion of the trial judge, and the trial judge's admission of such testimony will not be overturned unless it constitutes a clear abuse of discretion." *United States v. Paiva,* 892 F.2d 148, 156 (1st Cir.1989).

■ Here, Rule 701 would seem to permit the district court judge to allow Quezada's clarifying testimony. Carter made his comment while sitting in Quezada's minivan with Tom and Quezada, shortly after handing Quezada one ounce of crack cocaine. Quezada, as a participant in the conversation, had an opportunity to observe Carter's body language and to pick up several nuances that jurors, listening to the tape, might miss. Thus, while the court's ruling could have gone either way, we conclude that the judge had discretion to determine that the opinion was sufficiently based on the witness' observa-tions and sufficiently helpful to the jury to be admitted.

### 2. Agent's Vouching

Tom argues that the district court erred when it allowed the following exchange on redirect examination of DEA Special Agent Pevarnik:

Q. In fact, you were asked by [defense counsel] if [Quezada] was truthful and if you took steps to check his truthfulness. Do you remember those questions?

A. Yes.

Q. Did any facts come to your attention in the course of our investigation, agent Pevarnik, to indicate that [Quezada] had not been truthful with you?

After Tom's objection to the question was overruled, Pevarnik responded "No." According to Tom, this was improper bolstering in which the United States used its prestige to vouch for Quezada. Because Tom objected to the admission of Pevarnik's statement, we review for abuse of discretion. *Marino,* 277 F.3d at 24.

■ It is beyond dispute that the government may not use the "prestige of the United States" to enhance the credibility of a witness. *United States v. Rosario-Díaz,* 202 F.3d 54, 64 (1st Cir.2000). "It is also undisputed that the prosecution cannot accomplish such improper bolstering of a witness through the testimony of other government witnesses." *Id.* at 65 (citing *United States v. Mazza,* 792 F.2d 1210, 1214–1216 (1st Cir.1986)).

■ The government's question clearly was not intended to elicit improper vouching for Quezada, and Pevarnik did not, in fact, vouch for Quezada's credibility. Here, the government did not ask Pevarnik for his personal assurances as to Quezada's credibility. Rather, the govern-

ment's question to Pevarnik was directed at whether he had any specific evidence of Quezada's credibility or the lack thereof; that is, whether Pevarnik had learned of any specific facts that indicated that Quezada had not been truthful in the past. Government witnesses "may of course testify to facts within their personal knowledge that support or corroborate another witness's testimony." *Rosario–Díaz,* 202 F.3d at 65. Pevarnik was merely asked for facts, not opinions. Thus, admission of the testimony was not an abuse of discretion.

 While our above ruling ends the matter, we note further that even supposing error in admitting the testimony, it would have been harmless. "The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of trial." *See United States v. Rosales,* 19 F.3d 763, 767 (1st Cir.1994); *see also* Fed.R.Crim.P. 52(a). Here, it is unlikely that Pevarnik's one statement about whether he had learned any facts that made him aware whether Quezada was not truthful was outcome determinative. The evidence against Tom was voluminous: there were numerous recorded conversations in which Tom inculpated himself, and the testimony of Quezada, along with corroborating testimony by both Pevarnik and Burgos, provided ample support for the jury's verdict. In light of the other evidence, the jury would most likely have convicted even without Pevarnik's one comment about Quezada's truthfulness. Thus, the district court's admission of Pevarnik's statement was, at most, harmless error.

## D. Sentencing

Tom presents two sentencing-related issues on appeal. First, Tom claims the court below erred in failing to grant an adjustment for a minor role. Second, Tom argues that the district court erroneously failed to grant a downward departure based on criminal history. We affirm the district court's decision on both issues.

### 1. Adjustment for Minor Role

 Tom asserts that his participation in the instant offense qualifies as "minor," and that the sentencing Court ought to have adjusted his offense level downward accordingly. This Court reviews the district court's finding that a defendant is not a minor participant only for clear error, and the defendant bears the burden of proving that he is entitled to a downward adjustment for his role in the offense. *United States v. Meléndez,* 301 F.3d 27, 33–34 (1st Cir.2002). The determination of whether to apply the role in the offense adjustment is very fact-specific and "rarely reversed." *United States v. Murphy,* 193 F.3d 1, 8 (1st Cir.1999). A district court's determination of a defendant's role in an offense "cannot be clearly erroneous where it is based on a reasonable inference drawn from the undisputed facts." *United States v. DiIorio,* 948 F.2d 1, 5 (1st Cir.1991).

 A downward adjustment for a defendant's minor role in the offense is permitted for a defendant who is "substantially less culpable than [the] average participant ... but whose role could not be described as minimal." U.S.S.G. § 3B1.2, app. nn. 3(A), 5. An analysis of the issue asks whether the defendant "is less culpable than most others involved in the offense of conviction and less culpable than most other miscreants convicted of comparable crimes." *United States v. Ortiz–Santiago,* 211 F.3d 146, 149 (1st Cir.2000).

 The district court's denial of Tom's request for a minor role in the offense adjustment was not clearly errone-

ous. The evidence supports the district court's finding that Tom was not a minor participant in the two counts on which he was convicted. First, the evidence showed that it was Tom who brokered the drug transaction. Only Tom knew both Quezada and Carter, and it was Tom who reached out for Carter to provide crack cocaine to Quezada. Tom was also the one who either contacted Carter or gave Quezada the number to call. Tom ordered the crack for Quezada from Carter and discussed the price with Carter in Quezada's presence. Second, it was Tom who went to meet Carter while Quezada sat in his minivan. Tom vouched for the quality of the crack cocaine, for Carter's claim to have weighed it, and for Carter generally. Third, it was because of Tom that Quezada was able to purchase more crack cocaine— whether through Carter or through others to whom Carter had introduced Quezada. These facts show that Tom was a "player rather than a … dabbler" in the drug transaction. *Ortiz–Santiago*, 211 F.3d at 149. This Court has not found clear error in the district courts' rejection of a minor role adjustment in a number of cases involving analogous circumstances. *See, e.g., United States v. Sostre*, 967 F.2d 728, 732 (1st Cir.1992) (affirming denial of minor role adjustment where defendant "made the initial contact with the source; communicated the amount of drugs to be sold and its price; made all of the arrangements to bring the buyers and sellers together; allowed his house to be used as the situs of the drug transaction; and was present at the moment of the transaction").

Moreover, Tom has not shown that he was both less culpable than the other participants in the drug conspiracy and less culpable than most other defendants convicted of comparable crimes. *See United States v. Brandon*, 17 F.3d 409, 460 (1st Cir.1994) (affirming denial of § 3B1.2 adjustment where defendant was less culpable than major participants, but "not less culpable than most of the other defendants let alone substantially less culpable than an average defendant"); *United States v. Osorio*, 929 F.2d 753, 764 (1st Cir.1991) (denying mitigating role adjustment where defendant's participation not less than average participation in crime). Thus the district court did not err in refusing to make a mitigating role adjustment to Tom's offense level.

### 2. *Departure for Criminal History Category*

At sentencing, the district court declined Tom's request to grant a departure for an overestimated criminal history. The Probation Department calculated six points for Tom's Criminal History Category, which placed him in Category III under the Sentencing Guidelines. His criminal history was based on motor vehicle offenses, which were non-violent and not drug oriented. Tom argued that the classification overrepresented his criminal history because it was based on crimes that were not drug related. The Court refused to depart.

■ Section 4A1.3 of the Sentencing Guidelines authorizes a reduction in a defendant's criminal history category where the sentencing court believes that the category overstates the seriousness of a defendant's prior convictions or his propensity to commit future crimes. "The court of appeals has no jurisdiction, however, to review a district court's decision not to depart downward unless the district court misunderstood its authority to do so." *United States v. Johnstone*, 251 F.3d 281, 285 (1st Cir.2001). Thus we would only have jurisdiction if the district court's decision "not to depart [was] based on the court's mistaken view that it lack[ed] the legal authority to consider a departure."

*United States v. Romolo,* 937 F.2d 20, 22 (1st Cir.1991). Here, it is apparent that the district court simply chose not to depart.

The district court stated that it would not grant Tom's motion for a downward departure based upon overrepresentation of criminal history because Tom had not presented "sufficient facts" to warrant such a departure. The district court thus clearly "expressed that it had taken into account the arguments for a downward departure but concluded that the assigned criminal history category 'adequately and appropriately' represented [Tom's] extensive criminal history." *United States v. Mangos,* 134 F.3d 460, 465 (1st Cir.1998). Consequently, this Court lacks jurisdiction to review the district court's denial of a downward departure for criminal history.

### III. Conclusion

For the foregoing reasons, we affirm the district court's decision.

***Affirmed.***