# United States Court of Appeals
## For the First Circuit

No. 02-1248

UNITED STATES OF AMERICA,

Appellee,

v.

JEROME CAPELTON, a/k/a ANTHONY COLEMAN,

Defendant, Appellant.

No. 02-1460

UNITED STATES OF AMERICA,

Appellee,

v.

GARY WHITE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael Ponsor, U.S. District Judge]

Before

Selya, <u>Circuit Judge</u>,
R. Arnold, <u>Senior Circuit Judge</u>,[*]
and Lipez, <u>Circuit Judge</u>.

---

[*]Of the United States Court of Appeals for the Eighth Circuit,
sitting by designation.

_Alan Jay Black_ for appellant Jerome Capelton.
_Bernard T. O'Connor, Jr._ for appellant Gary White.
_Daniel S. Goodman_, U.S. Department of Justice, with whom _Michael J. Sullivan_, United States Attorney, and _Todd E. Newhouse_, Assistant United States Attorney were on brief for appellee.

November 26, 2003

**LIPEZ**, **Circuit Judge**.  On September 21, 2000, a grand jury returned a ten-count indictment against defendants Jerome Capelton and Gary White.  The grand jury indicted White on nine counts of illicit drug activity, including one count of conspiracy to possess with intent to distribute cocaine, one count of distribution and possession with intent to distribute cocaine powder, and seven counts of distribution and possession with intent to distribute cocaine base.  Capelton was also charged with the conspiracy count, and additionally indicted on three counts of actual distribution of cocaine base (two of which were charged against White as well).

The district court denied Capelton's pre-trial motions to 1) suppress evidence and statements obtained by law enforcement, and 2) sever the proceedings into separate trials for each defendant.  The trial commenced on September 10, 2001.  The proceedings were briefly halted in response to the events of September 11, but the trial resumed on September 13 and concluded on September 26.  After the case was submitted, the jury convicted the defendants of all counts in the indictment.  The court sentenced Capelton to a term of 360 months of imprisonment and five years of supervised release, and sentenced White to a term of 292 months and five years of supervised release.

The defendants filed timely appeals from their convictions and sentences, raising a plethora of challenges to the

district court's case management, evidentiary rulings, and sentencing determinations. After a careful review of the record, we find no basis for overturning the defendants' convictions or vacating their sentences.

## I.

At trial, the government portrayed Capelton and White as links in a conspiracy to distribute cocaine powder and cocaine base over the period from December 21, 1999 to August 23, 2000.[1] The inner-workings of the conspiracy were exposed in an elaborate sting operation orchestrated by undercover police officer Alan Fisher of the Chicopee, Massachusetts police department, and aided by the Drug Enforcement Administration (DEA). Fisher launched the operation by contacting Christopher Weeks, a cooperating informant with whom he had worked on several occasions in the past. Weeks, who was incarcerated with White in the Ludlow House of Correction in mid-1999, introduced the officer to White on December 7, 1999. Over the conspiratorial period alleged in the indictment, Fisher purchased cocaine from White on numerous occasions. On December 21, White sold Fisher half an ounce of powder cocaine for $500. Two weeks later, Fisher purchased four ounces of crack cocaine for $4,000. Fisher also arranged drug transactions with White on March 17, March 24, and May 7 for one ounce of crack cocaine ($1,000),

---

[1] We present facts here to convey a general impression of the case. We provide additional facts where they are pertinent to the legal analysis.

-4-

5.5 ounces of crack cocaine ($5,000), and five ounces of crack cocaine ($4,800) respectively.

White's modus operandi was established from the early stages of the conspiracy. He acted strictly as a middleman, and kept no drugs, money, weapons, or drug paraphernalia on his person or in his residence. When Fisher expressed an interest in purchasing a specified quantity of cocaine, White contacted various suppliers with whom he associated, obtained the requested quantity, and conveyed the drugs to Fisher. Capelton entered the conspiracy as White's primary drug supplier after the May 7 transaction. On June 2, 2000, Capelton supplied White with ten ounces of crack cocaine that Fisher purchased for $9,000. Fisher purchased another $6,000 worth of crack cocaine from Capelton through White on July 24, and bought 5.5 ounces of crack cocaine from the defendants on August 23, 2000.

After the August 23 transaction, Capelton purchased some gasoline for his car, picked up two passengers in a parking lot, and started driving south on Route 91 in Connecticut. DEA agents, who had been following Capelton, contacted the Connecticut State Police and asked them to pull Capelton over. They did so after he changed lanes without signaling, and the DEA agents parked their cars behind the police cruiser. The police frisked Capelton and found $3,250 in marked bills matching those that Detective Fisher gave to White. After the DEA agents informed Capelton that they

were going to seize that money, he followed them to the state police barracks to get a receipt for the funds. The agents did not arrest Capelton until September 21, 2000. White was also arrested on September 21, 2000 while he was negotiating another cocaine sale with Officer Fisher.

The execution of the sting operation was controversial in two respects that are relevant to these appeals. First, White insisted that Weeks coerced him into procuring drugs for Fisher through threats, intimidation and harassing phone calls both to him personally and to his mother, who was living at a different address during the relevant period. Although White conceded at trial that he had participated in each drug sale to Fisher, he argued that he was the victim of unfair entrapment resulting from Weeks' heavy-handed tactics. The government's efforts to counter White's entrapment defense were complicated by its inability to locate Christopher Weeks and subpoena him as a witness. Fisher admitted at trial that Weeks' recruitment of White was not choreographed or closely supervised by law enforcement officials, and White's mother testified that Weeks made repeated efforts to contact White by telephone.

The frequent malfunctioning of surveillance equipment over the course of the sting operation was also a source of dispute at trial. The participating law enforcement officers and agencies went to considerable lengths to both video and audio-tape Fisher's

encounters with White and Capelton. However, equipment failures and quality control problems with the audio and visual recordings limited the probative value of those recordings, and forced the prosecution to rely heavily on the eyewitness accounts of the police officers and DEA agents who conducted the surveillance.

II.

We begin by addressing the objections raised jointly by both defendants, and conclude with an analysis of the challenges raised separately by each defendant.

## A.        The September 11 Tragedy

On September 11, after opening statements, the district court informed the jurors of the events that had transpired in New York City and Washington D.C. that morning, and suspended the proceedings because the courthouse in Springfield was closed for security reasons. The courthouse remained closed the next day because of a widely-publicized bomb threat. When the defendants' trial resumed on September 13, Capelton and White immediately moved for a mistrial on two grounds. As a general matter, they asserted that the jurors would be unable to maintain their focus on their case given the chaos and uncertainty arising from the events of the previous two days. More importantly, counsel argued that the media's portrayal of the attacks and the military response as a "battle of good versus evil" established a particularly prejudicial environment for defendants accused of committing "evil" acts. In

counsels' view, this prejudice was exacerbated by defendants' reliance on a strategy of discrediting law enforcement officers and federal agents whose colleagues were perceived as heroes in the aftermath of the World Trade Center attacks.

A district court's denial of a motion for mistrial is reviewed for abuse of discretion.  <u>United States</u> v. <u>Lee</u>, 317 F.3d 26, 34 (1st Cir. 2003); <u>United States</u> v. <u>Rivera-Gomez</u>, 67 F.3d 993, 998 (1st Cir. 1995).  In response to defendants' request, the judge voir dired each juror individually, and excused the only juror who indicated that the September 11 attacks might alter his attitude toward the case.  The court also issued a lengthy instruction to the jury as a whole both before resuming the proceedings, and again at the close of the evidence.  These instructions admonished the jurors that the events of September 11

> cannot influence how you evaluate witnesses, and . . . you may not permit these events to influence your deliberations or decision in any way.  Both the defendants and the public expect that you will fairly and impartially consider all the evidence in the case, follow the law as stated by the court and reach a just verdict.

The court proceeded with an abundance of caution in the wake of September 11.  In the absence of particularized allegations of prejudice from defendants, we find no evidence that they were denied their Sixth Amendment right to an impartial jury, and accordingly conclude that the court did not abuse its discretion in denying defendants' motion for a mistrial.

**B.** **The Government's Opening Statement and Closing Argument**

In his opening statement, the prosecutor referred to White and Capelton as "drug dealer number one" and "drug dealer number three" while describing a scene in front of White's residence that he would later show to the jurors on videotape. The government also explained that defendant Capelton's voice was never caught on audio-tape because he was "a pretty clever drug dealer."

Assuming arguendo that defendants properly preserved their objection to the prosecution's opening remarks, we find no "manifest abuse of discretion," United States v. Mooney, 315 F.3d 54, 59 (1st Cir. 2002), in the court's refusal to grant a mistrial after the government's opening statement. To prevail on this ground for a new trial, defendants must demonstrate that the prosecutor's comments "so poisoned the well that the trial's outcome was likely affected." United States v. Mejia-Lozano , 829 F.2d 268, 274 (1st Cir. 1987). Defendants' allegations fall considerably short of this threshold.

It is true that "a lawyer may not, in the presence of the trier of fact[,] state a personal opinion about the . . . the guilt or innocence of an accused." Restatement (Third) of Law Governing Lawyers Sec. 107 (2000). Ideally, to preclude any argument of error, the prosecutor might have used the locution that "the evidence will show" that the defendants were drug dealers. Such a locution avoids any suggestion that the prosecution is offering a

personal opinion about the guilt of the defendants. However, the opening statement of the prosecution was preceded by the reminder from the trial judge that:

> the words of counsel are not evidence, and if there's any difference between this prediction of what the evidence will show and what you actually hear from the witness stand, you of course are to be guided by and consider only evidence as it comes in through the testimony of the witnesses or other documents or exhibits in the case.

In fact, the government introduced substantial evidence proving that Capelton and White were drug dealers. Under these circumstances, even if the prosecution's conclusory references to "drug dealers" could be deemed inappropriate expressions of opinion on guilt (an issue we do not decide), those references did not unfairly inflame or prejudice the jury against the defendants.

Capelton also alleges that the government "inflamed the jury" by misrepresenting statements made by his counsel during closing argument. While commenting on inconsistencies in the testimony of the two police officers who stopped Capelton's car on August 23, 2000, his attorney recalled one officer's testimony that only one child was in the backseat of Capelton's car when he was pulled over by the Connecticut State Police:

> Now, everybody else said two, every officer said two. Let's assume that it's two, he remembers one. Why does he remember one? Because he lost his police report. How does that bear on other testimony? Because all the officers that testified <u>rely</u> on other people's reports.

The prosecutor apparently understood Capelton's attorney to say that "all the officers that testified will lie on other people's reports," and argued to that effect in his rebuttal to the defendants' closing arguments.  Capelton immediately objected to that statement and requested a mistrial.  On appeal, he claims that he was prejudiced by the prosecutor's attribution of those comments to his attorney.

We apply abuse of discretion review to a district court's refusal to grant a mistrial on the basis of an inappropriate remark by the prosecution in its closing argument.  United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000).  Here, Capelton does not claim that the government intentionally misrepresented defense counsel's statements, or otherwise acted in bad faith.  While the transcript produced on appeal contains the word "rely," even the court was unable to discern what Capelton's attorney actually said.  Nevertheless, the judge issued the following curative instruction to the jury:

> First of all, as you heard the closings I believe Mr. Newhouse [the prosecutor] made reference to his recollection of a statement made during Mr. Black's closing.  His recollection of this statement was that Mr. Black said, "All officers will lie on other officer's reports."  During the break I wanted to make sure you understand that Mr. Black's recollection of what he said, and his intent was to say, "All the officer's rely on other officer's reports."  I passed that on to you so that you will know it, but remind you again that it's your recollection of what is said

> that controls, not mine or the attorneys' recollection of what was said.

This corrective instruction refutes any argument that the district court abused its discretion in denying the request for a mistrial.

**C.        Defendant Capelton's Claims**

**1.        Motion to Sever**

Capelton moved the district court for a severance after White disclosed in a pre-trial hearing that he would be presenting a defense of entrapment. Anticipating that White would implicitly concede his participation in the course of presenting this defense, Capelton argued that White's entrapment defense would undermine his own strategy of denying participation in the conspiracy and putting the government to its proof.

We review the denial of a severance motion for manifest abuse of discretion. United States v. DeLeon, 187 F.3d 60, 63 (1st Cir.), cert. denied, 528 U.S. 1030 (1999). Capelton acknowledges on appeal "that the standard for severance is a strict one and the defendant must show that he could not have received a fair trial." Indeed, we have previously recognized the general rule that "defendants charged in the same indictment should be tried together," United States v. Houle, 237 F.3d 71, 75-76 (1st Cir.), cert. denied, 532 U.S. 1074 (2001), and expressed reluctance to reverse a denial of severance where the defenses at issue are only "somewhat antagonistic," United States v. Serafino, 281 F.3d 327, 329 (1st Cir. 2002), and not "so irreconcilable as to involve

-12-

fundamental disagreement over core and basic facts," <u>United States</u> v. <u>Pena-Lora</u>, 225 F.3d 17, 34 (1st Cir. 2000) (internal quotations omitted).

Without elaborating at pointless length, we conclude that Capelton's skeletal argument for reversal on this ground is unavailing in light of 1) his failure to point to any specific testimony at trial that prejudiced his own defense, and 2) the court's explicit instruction to the jury that

> you must consider the counts and the defendants separately. Mr. White and Mr. Capelton are charged with several different counts in the indictment. The counts, and the defendants, have been joined for trial. However, the counts and the defendants must be considered separately.

## 2.      **Motion to Suppress**

At 3:00 p.m. on August 23, 2000, Connecticut State Troopers Jeffrey Campbell and John Tollis received a cell phone call in their police cruiser from a federal surveillance team monitoring Capelton's movements. DEA agents provided the officers with a description of Capelton's vehicle, and informed the troopers that the defendant was traveling south on Interstate 91, having just left the scene of a drug transaction in Springfield. The officers positioned their vehicle behind Capelton, and pulled the defendant over after observing him switch lanes without using his turn signal. A "pat frisk" of the defendant revealed a large wad of money in his front pocket that matched, upon examination, the

-13-

serial numbers of the "buy money" that Fisher had earlier used to purchase crack cocaine from White. Because the government's surveillance tapes failed to record Capelton actually exchanging drugs for money, the marked bills found on defendant's person were the linchpin of the government's circumstantial case against Capelton.

Not surprisingly, Capelton argues on appeal that the district court erred when it denied his motion to suppress this physical evidence. We will review this claim by considering whether the Connecticut State Police had sufficient cause, apart from the traffic violation,[2] to stop Capelton's vehicle and whether they had probable cause to search his person and to seize the serialized money.

"Our review of the ultimate determinations of probable cause and reasonable suspicion on a motion to suppress is de novo. Review of subsidiary factual findings is for clear error." United States v. Scott, 270 F.3d 30, 39 (1st Cir. 2001) (citations omitted). The Connecticut State Police needed an "articulable and reasonable suspicion that [Capelton] was engaged in criminal activity" to justify a Terry stop of his car. United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) (upholding a Terry stop of

---

[2]We say "apart from the traffic violation" only because the trial judge did not factor the violation into his analysis of the legal basis for the stop. There is no question that the traffic violation alone provided a sufficient basis for the stop.

-14-

a pickup truck ). While this involves more than a mere "hunch," Terry v. Ohio, 392 U.S. 1, 27 (1968), "the level of suspicion required for a Terry stop is obviously less demanding than for probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

Detective Fisher's detailed testimony during the pretrial evidentiary hearing on the motion to suppress recounted the DEA agents' close surveillance of Capelton before, during and after the August 23 drug transaction. The knowledge may be imputed from the DEA agents to the state police who actually effectuated the stop under the "fellow officer rule." United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) ("[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation.") In a case very similar to this one, we concluded that "there [was] no doubt that the police were justified under Terry in stopping" the defendant's vehicle after observing him sell drugs to an undercover officer, United States v. Schiavo, 29 F.3d 6, 9 (1st Cir. 1994), and we reach the same conclusion here. The police observed Capelton engage in illegal drug sales and then pulled him over. As was the case in Schiavo, there is no doubt that the Terry stop was justified.

The next inquiry is whether the officers' warrantless search of Capelton's front pocket and their seizure of the serialized currency was justified. While it would have been

permissible for the police to search Capelton's car incident to the stop, "[t]he search of one's person is more intrusive on the rights protected by the Fourth Amendment than the search of an automobile." Schiavo, 29 F.3d at 9. Therefore, we will only uphold the search if the police demonstrated that they had probable cause and that exigent circumstances justified the search in the absence of a warrant.

We can easily dismiss the second factor. The district court concluded that the officers did not need a warrant to conduct this search in light of the "exigent circumstance" that Capelton was mobile at the time the police developed probable cause. This created a risk that the evidence would be "spirited away," Florida v. White, 526 U.S. 559, 565 (1999), if the officers delayed the search until a proper warrant could be secured. On appeal, Capelton does not question the existence of exigent circumstances. Thus, we will confine our review to the issue of probable cause.

Probable cause for a search can be demonstrated by "'facts and circumstances . . . sufficient in themselves to warrant a man of reasonable caution in the belief that' he was observing criminal activity and the fruits of criminal activity." United States v. Ferrara, 539 F.2d 799, 801 (1st Cir. 1976) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). The

district court felt that the police surveillance on August 23 provided sufficient probable cause to execute the search:

> The defendant was positively identified by two officers, both of whom had an ample opportunity to observe him and who had seen him on previous occasions. Further, he was identified by Gary White as the source of the drugs, and the pattern of activity clearly indicated that it was the defendant who provided White with the crack cocaine given the undercover agent that day.

Teams of surveillance agents continuously followed Capelton after the sale. Other than getting out to pump his gas, he did not leave the car between the time of the sale and when he was stopped by the officers. Therefore, the police were justified in believing that the fruit of his criminal activity, the serialized currency, was in his possession. This belief provided them with sufficient probable cause to justify the search.

3.      **Hearsay Statements of Co-Conspirators Admitted Under Rule 801(d)(2)(E)**

Federal Rule of Evidence 801(d)(2)(E) excludes from the category of hearsay "statement[s] by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). As a predicate for admitting evidence under this rule, the trial court must conclude that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). In our circuit,

-17-

this determination is referred to as a Petrozziello ruling. Significantly, the trial court is not required to decide the Petrozziello question prior to admitting hearsay statements under Rule 801(d)(2)(E), but may "admit the statement[s] provisionally, subject to its final Petrozziello determination at the close of all the evidence." United States v. Isabel, 945 F.2d 1193, 1199 n.10 (1st Cir. 1991). Generally, "we review the trial court's determination that statements were coconspirator statements under the clear error standard." United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002) (citing United States v. Mojica-Baez, 229 F.3d 292, 304 (1st Cir. 2000)). This deferential standard of review places a heavy burden on a defendant seeking to overturn a trial court's Petrozziello ruling. Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1080 (1st Cir. 1995).

In United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993), we held that "a coconspirator's statement, standing alone, is insufficient to meet the preponderance standard of Rule 801(d)(2)(E) . . . [A]dmitting the statement into evidence requires some extrinsic proof of the declarant's involvement in the conspiracy." Id. at 1181-82. Capelton unpersuasively argues that the government failed to produce any "extrinsic proof" linking the co-defendants. Marked bills from the August 23, 2000 transaction between Fisher and White were found on Capelton's person when he was arrested. The record also indicates that

surveillance videos introduced by the government depict Capelton arriving at White's residence, and show White walking back and forth between Fisher's car and Capelton's car during the July 24 and August 23 drug transactions. This evidence easily satisfies the "extrinsic proof" requirement of Sepulveda, and we accordingly find no clear error in the district court's Petrozziello ruling.[3]

**4.      Sentencing**

Capelton claims that the district court erroneously denied him a downward departure under § 5H1.6 of the United States Sentencing Guidelines, and argues that this provision "allows for a downward departure for unusual family circumstances." At Capelton's sentencing hearing, the court took note that the defendant grew up with drug addicted parents, and was forced to live on the streets and provide for his younger brother from the time he was twelve years old. The court commented that it had "rarely encountered a childhood as horrendous as this," and acknowledged that "the defendant's situation, as he was growing up, [was] almost unimaginably difficult."

---

[3]Capelton raises but does not develop three additional challenges--a sufficiency of the evidence challenge, a due process challenge involving the pen registers, and a challenge to the court's aiding and abetting instruction--that we deem waived. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The judge nonetheless rejected Capelton's motion for a downward departure, citing the defendant's extensive criminal background and his failure to take advantage of numerous opportunities to rehabilitate himself: "I am persuaded . . . that the defendant has had an awfully large number of bites of the apple and, unfortunately, this is the time when the chickens come home to roost . . . . [U]nfortunately, I don't think there's any basis for downward departure in this case."

Our prior jurisprudence establishes that we "lack jurisdiction to review a discretionary decision not to depart from the Sentencing Guidelines." United States v. Mejia, 309 F.3d 67, 70 (1st Cir. 2002); see United States v. Louis, 300 F.3d 78, 81 (1st Cir. 2002). We may review a sentencing court's conclusion that it does not have legal authority to depart from the sentencing guidelines, Mejia, 309 F.3d at 69-70; however, the court recognized that it had such authority here. Therefore, we will not review the court's discretionary decision.

**D.      Defendant White's Claims**

**1.      Entrapment**

The entrapment defense protects "an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." Jacobson v. United States, 503 U.S. 540, 553-54 (1992). As we have previously noted: "Entrapment is called a defense, but it is settled that once the

-20-

defendant has made a threshold showing, the burden shifts to the government to prove beyond a reasonable doubt either that there was no undue government pressure or trickery or that the defendant was predisposed." United States v. Acosta, 67 F.3d 334, 338 (1st Cir. 1995). Since this is a disjunctive test, the entrapment defense fails if the government can prove beyond a reasonable doubt either that 1) it did not improperly induce the illegal activity or 2) the defendant was otherwise predisposed. See, e.g., Mathews v. United States, 485 U.S. 58, 62-63 (1988); United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994). White claims that there was insufficient evidence to prove either the absence of improper inducement or predisposition. We disagree with both contentions.[4] Given the disjunctive nature of the test, we can fulfill our appellate function by elaborating our disagreement on either inducement or predisposition. We choose to focus on inducement.

As we held in Gendron, inducement means more than simply organizing a "sting" operation and giving the defendant the opportunity to commit a crime. Gendron, 18 F.3d at 961. See also

_____

[4]We review a sufficiency of the evidence claim de novo; however, in doing so "we review all the evidence, direct and circumstantial, in the light most charitable to the prosecution, drawing all reasonable inferences consistent with the verdict, and eschewing credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. LaFreniere, 236 F.3d 41, 45 (1st Cir. 2001).

United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994) ("Neither mere solicitation nor the creation of opportunities to commit an offense comprises inducement as that term is used in the entrapment jurisprudence."). "An 'inducement' consists of an 'opportunity' plus something else-- typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." Gendron, 18 F.3d at 961.

White claims that Weeks, the police informant, used excessive pressure to force him to sell drugs. He claims that Weeks repeatedly threatened him and his family while they were incarcerated together and demanded that White "hook him up" with a drug source. After they were released from jail, Weeks supposedly continued these threats and forced him to sell drugs to Officer Fisher even after White initially refused to do so. Based on this testimony, which was not corroborated by any other witness, White claims that the government impermissibly induced him to engage in criminal activity.

Our review of the record undercuts White's claim of excessive pressure by the government. The evidence showed that he never reported the alleged threats to the correctional officers or to the police, associated with drug dealers and had multiple sources of drugs, possessed specific knowledge related to the drug trade (e.g. he was familiar with specific terminology and prices,

-22-

and claimed to be able to make crack cocaine), sold Detective Fisher drugs on eight separate occasions, gave the detective his phone number so that the two could deal directly without going through Weeks, and continued to sell cocaine even after Weeks stopped contacting him. In addition, the government introduced surveillance tapes in which, according to the trial judge, "[White] doesn't look anything like a person who's being entrapped . . . ." It also introduced audio tapes on which White was heard telling Fisher that the drugs that he was going to sell him "were top shelf." Taken together and viewed in a light favorable to the verdict, that evidence could lead a rational jury to conclude beyond a reasonable doubt that White voluntarily sold drugs to Detective Fisher and that Weeks did not force him to do so.[5]

## 2.    Discovery Abuse

White claims that the lower court erred when it refused to grant a mistrial based on the government's alleged discovery abuse. In order to prevail on a discovery abuse claim, a

---

[5]White also tries to restate his inducement arguments as Fifth Amendment "outrageous government conduct" violations. As we have previously observed: "[The outrageous government conduct] doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity." United States v. Santana, 6 F.3d 1,4 (1st Cir. 1993). See also United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990) ("[W]e have yet to review a situation where official conduct crossed the constitutional line; rather, an unbroken string of First Circuit cases has repulsed attempts to win dismissal of criminal charges on such a theory."). In any event, since the government so easily defeated the inducement prong of the entrapment analysis, White's due process claim, even if available under the law, fails.

defendant must show 1) that the government wrongfully withheld evidence and 2) that the defendant suffered prejudice as a result. United States v. Nickens, 955 F.2d 112, 126 (1st Cir. 1992). White's claim fails both of these requirements.

Prior to trial, White sent the government a letter pursuant to local rule 116.3(A)[6] requesting the following:

> Disclosure of all prior subsequent [sic] crimes, wrongs or acts allegedly committed by each and any one of the Defendants upon which the Government intends to rely or of which the Government intends to offer evidence to prove motive, scheme, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident . . . .

The government sent White copies of his prior convictions in response to that letter, but it did not include any investigative reports or memoranda.[7] White claims that the government wrongfully

---

[6]District of Massachusetts Local Rule 116.3(A) states: (A) Within forty-two (42) days of arraignment, any party by letter to the opposing party may request discovery. The opposing party shall reply in writing to the requests contained in such letter, no later than fourteen (14) days after its receipt, stating whether that party agrees or does not agree to furnish the requested discovery and, if that party agrees, when the party will furnish the requested discovery. A copy of the discovery request letter and any response must also be filed with the Clerk's Office.

[7]The government properly referred to the requested documents as Fed. R. Evid. 404(b) (concerning the defendant's prior bad acts) and 609 (concerning prior convictions) evidence. Rule 404(b) requires the government to disclose "in advance of trial . . . the general nature of any such evidence it intends to introduce at trial." Although White did not frame his argument in 404(b) terms, relying instead on Local Rule 116.3(a), his general "discovery abuse" claim is essentially a 404(b) claim. Our analysis would be

-24-

withheld a surveillance record that DEA Agent Shuler prepared as part of a prior investigation of other drug dealers. Even though White was not a target of that investigation, he claims that the surveillance took place at his address, thus making the report a form of prior bad acts evidence. Furthermore, he claims that the government's failure to produce that report prejudiced his ability to prepare a defense.

We conclude that this report was not covered by White's pretrial discovery request; therefore, the government was not required to produce it. White was not a target of the earlier DEA investigation. He is only mentioned in the report because the government conducted its surveillance of the suspects in the vicinity of his home. While the jury may have drawn negative inferences from White's association with drug suspects, it is a stretch to deem this association a bad act within the meaning of Rule 404(b). See United States v. Reed, 647 F.2d 678, 686 (6th Cir. 1981) (holding that testimony concerning the defendants' past association with known thieves and their presence at a "hangout for thieves" did not constitute 404(b) evidence). Furthermore, there is no evidence that the government intended to use that report against White. The jury only learned about the prior investigation because White's attorney asked DEA Agent Shuler whether he had heard the name "Gary White" before Shuler started

the same under either approach.

his investigation with Detective Fisher.[8]  In doing so, he forced Shuler to discuss the earlier investigation.  The government's attorney did not reference the report on direct examination, and there is no hint in the record that the material in this report would have been introduced if White's attorney had not pressed Agent Shuler on the matter.[9]

## 3.        Sentencing

White's final three claims regard errors that the court allegedly made at sentencing.

### a.        Acceptance of Responsibility

White claims that the district court erred by not reducing his sentence under Section 3E1.1 of the United States Sentencing Guidelines, based on his acceptance of responsibility for his actions.  Since the sentencing court can best determine whether the defendant "clearly demonstrates a recognition and affirmative acceptance of personal responsibility," we accord great deference to decisions rejecting an acceptance of

---

[8]Prior to Agent Shuler's testimony, White's attorney asked another agent, James Clifford, whether he had heard White's name associated with drug sales.  Clifford simply answered that he had seen White's name connected with Agent Shuler's investigation.  He did not provide further details regarding the content of that investigation.

[9]We also note that White failed to request a continuance when he first discovered the alleged abuse.  Thus, we may presume a lack of prejudice.  United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993) ("As a general rule, a defendant who does not request a continuance will not be heard to complain on appeal that he suffered prejudice as a result of late-arriving discovery.").

responsibility claim. U.S.S.G. § 3E1.1 cmt. n. 5. We only reverse such decisions on a showing of clear error. United States v. Walker, 234 F.3d 780, 784 (1st Cir. 2000).

White claims that since he never contested his "factual guilt," he should qualify for a reduced sentence. That view is not supported by our case law. While we have not held that a defendant will always forfeit his chance for a 3E1.1 adjustment by adopting an entrapment defense, we have held that an adjustment in such a situation would be rare. See, e.g., United States v. Baltas, 236 F.3d 27, 37 (1st Cir. 2001) ("'This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.'") (quoting U.S.S.G. Sec. 3E1.1 cmt. 2); United States v. DeLeon Ruiz, 47 F.3d 452, 455 (1st Cir.1995) ("[A]bsent unusual facts, we will . . . generally sustain a district court that denies acceptance of responsibility to a defendant who declined to plead guilty on the count or counts of which he was convicted.").

This case does not qualify as one of those rare exceptions. White was caught on video and audio tape selling powdered and crack cocaine to an undercover agent. When the government attempted to arrest him, he fled and forced the agents to run through yards and to jump over fences to apprehend him. At trial, he adopted what the judge termed "a very, very weak

entrapment defense" and forced the government to bear the burden of proving its case against him. Given all of the evidence that the government marshaled against him, it would have been futile for White to contest his "factual guilt" at trial; therefore, considering his continuous refusal to accept responsibility, we can hardly say that the court clearly erred in refusing a downward adjustment for acceptance of responsibility.

**b.          Minor Participant**

White argues that, even though he was the only party who was involved in all of the drug transactions, the court erred when it refused to consider him a "minor participant" for sentencing purposes. We review this claim for clear error. <u>United States</u> v. <u>Melendez</u>, 301 F.3d 27, 33 (1st Cir. 2002).

In order to receive a downward adjustment for being a "minor participant," a defendant must demonstrate, inter alia, that he "is less culpable than most other participants" in the crime for which he was convicted. U.S.S.G. § 3B1.2, cmt 3. White cannot meet that standard. The sentencing judge characterized him as the "hub of the wheel" in these transactions and observed:

> Mr. White here was involved in every single deal. He was the central figure in these deals and he's not entitled to any downward departure based upon any minor participation or being a minor participant. He was, if anything, I think the major, perhaps the primary participant.

Since he was an integral link in all eight drug transactions, we cannot find any clear error in the sentencing judge's decision to deny a downward adjustment.

**c.        Sentencing Factor Manipulation**

Finally, White claims that the court erred by not granting him a downward departure to counteract the government's improper enlargement of his crime. He asserts that the government "arranged" to have him sell drugs on eight separate occasions rather than simply arresting him after the first sale and that this conduct impermissibly extended his sentence.

As we discussed in United States v. Montoya, 62 F.3d 1, 4-5 (1st Cir. 1995), downward departures based on sentencing factor manipulation are equitable remedies that courts only invoke in "the extreme and unusual case." White bears the burden of demonstrating that the government engaged in "extraordinary misconduct," and that it improperly enlarged either the scope or the scale of the crime. In considering this claim, we will "focus primarily--though not necessarily exclusively--on the government's conduct and motives." United States v. Gibbens, 25 F.3d 28, 31 (1st Cir. 1994).

Assuming arguendo that we have jurisdiction to review this claim, we conclude that White failed to introduce sufficient evidence to demonstrate that the government improperly extended the duration of its investigation in an effort to extend his

sentence.  While it could have arrested White after the first sale, it does not appear that its failure to do so was motivated by malice or bad faith.  See United States v. Terry, 240 F.3d 65, 71 (1st Cir. 2001) (concluding that the government acted in good faith when it claimed, inter alia, that it extended the duration of its investigation to identify other members in the drug network).  In fact, since White used multiple sources of drugs, the government's extension of the investigation allowed it to identify more dealers.  Since White failed to demonstrate that the government engaged in extraordinary misconduct, we reject his sentencing manipulation claim.

## III.

For the foregoing reasons, we AFFIRM the convictions and sentences of both appellants.

SO ORDERED.