# United States Court of Appeals
## For the First Circuit

---

No. 02-2304

UNITED STATES OF AMERICA,

Appellee,

v.

TERRENCE WARNER GLAUM, a/k/a Smitty,
a/k/a Terrence Glaum, a/k/a Terry W. Case,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Torruella, Howard, Circuit Judges,
and Schwarzer,* Senior District Judge.

---

Lisa M. Sheehan for appellant.
F. Mark Terison with whom Paula D. Silsby, United States
Attorney was on brief for appellee.

---

January 28, 2004

---

*Of the Northern District of California, sitting by
designation.

**HOWARD**, **Circuit Judge**.     Defendant Terrence Glaum appeals from his conviction and sentence for participating in a marijuana distribution conspiracy.  He raises several claims of error.  We affirm.

## I.  Background

We state the facts in the light most favorable to the jury's verdict.  See United States v. Diaz, 300 F.3d 66, 69 (1st Cir. 2002).

### A.     Glaum Joins the Conspiracy

The conspiracy underlying this prosecution operated to distribute Mexican-grown marijuana throughout the United States. The head of the conspiracy was a man known only as "Jefe."  He raised large crops of marijuana for shipment across the border.  An individual known as the "Old Man" or "Dad" worked under Jefe as his chief distributor.  The Old Man received large shipments of marijuana from Jefe to distribute to other dealers, including Anthony Salsberry, who operated out of San Diego.  Salsberry, in turn, would distribute the marijuana to other smaller dealers, who would sell the drugs to users.  Among Salsberry's customers were an individual in New York, Ralph Martino, and two individuals in Maine, Ronnie Kerrigan and Paul Sekenski.

As part of his operation, Salsberry employed Glaum's ex-wife, Sheila Case, to assist him in shipping the marijuana.  In the middle of 2000, Case asked Salsberry if he could put Glaum "to

work."  Salsberry agreed and provided Glaum with approximately fifty pounds of marijuana to sell in Arizona.  In addition to his work distributing marijuana, Glaum assisted Salsberry in packaging the drugs.  Working out of his garage, Glaum weighed, "shrink wrapp[ed]" and "vacuum seal[ed]" marijuana to prepare it for shipment.  As compensation, Salsberry paid Glaum "a percentage" of the profits.

At approximately the same time that Glaum started working for Salsberry, the Old Man offered Salsberry a two-ton load of marijuana to distribute.  After a portion of the load was smuggled across the border, Salsberry obtained a sample to send to Martino to gauge his interest in purchasing the load.

In mid-October 2000, after receiving word from Martino that he was interested, Salsberry met with Jefe and the Old Man in San Diego to discuss the Martino deal.  At this meeting, Jefe and the Old Man told Salsberry that only one ton would be available immediately and that the other ton would be placed "on hold".[1]  Salsberry concluded the meeting by telling his superiors that he would organize the transportation of the load to Martino.

Salsberry knew that Martino could arrange to transport the shipment himself, but Salsberry preferred to find an alternate method so that he could charge Martino a higher fee.  In a

---

[1] Martino later rejected the second ton because of its poor quality.

-3-

subsequent conversation with Glaum, Salsberry learned that Glaum had access to several trucks which could be used to ship the marijuana to New York.

Soon after this conversation, Salsberry attended another meeting with Jefe and the Old Man. This time Glaum also attended, and Salsberry introduced him to the heads of the organization. At this meeting, Salsberry assured the Old Man and Jefe that Glaum was capable of organizing the transportation for the Martino deal but that he could not begin the transport for two weeks. The participants therefore agreed that for two weeks the deal would remain "on hold."

### B.    Salsberry's Arrest and Cooperation

On November 14, 2000, during the two-week hiatus in the Martino deal, Salsberry was arrested after one of his drivers turned him in to authorities. After his arrest, Salsberry was incarcerated in San Diego. From jail, Salsberry called Glaum to check on the Martino deal and to inform him of his status. While Salsberry was incarcerated, he spoke to Glaum nearly every day. During these calls, Glaum assured Salsberry that "he wouldn't let [him] down" and that he "wanted to keep things going." The two eventually agreed that Glaum would carry on Salsberry's business while Salsberry was in jail.

On November 18, 2000, Glaum sent his attorney, Phil Gagnon, to meet with Salsberry in jail. Gagnon served as an

intermediary between Glaum and Salsberry, meeting with Salsberry on several occasions. At one of their meetings, Salsberry provided Gagnon with Ronnie Kerrigan's and the Old Man's telephone numbers.

On January 17, 2001, Salsberry decided to cooperate with the government. Soon afterwards, Drug Enforcement Agency ("DEA") Agent Paul Wolf traveled from Maine to California to debrief Salsberry. As part of his cooperation agreement, Salsberry agreed to remain in contact with Glaum and Gagnon and to provide Glaum with Wolf's pager number. Eventually, Salsberry gave Glaum the pager number, pretending that it belonged to Paul Sekenski.

**C.      The Sting Operation**

Wolf returned to Maine from meeting with Salsberry on January 19, 2001. Two days later, he received an electronic page from Glaum. In their introductory call, Glaum identified himself as a friend of Salsberry and asked Wolf if he wanted "to discuss doing some business." Glaum said that he soon would be traveling to Maine to bring drugs to Ronnie Kerrigan and that he would be able to deliver drugs to Wolf at that time. Wolf told him that he would have to "check [him] out" before placing an order. Glaum invited Wolf to call him when he was ready to deal.

On January 24, 2001, Wolf called Glaum. After Glaum explained how he had become associated with Salsberry, Wolf broached the subject of the Martino deal. Wolf asked Glaum if he knew Martino. Glaum stated that he knew "of him" but that he knew

"Dad real well." At the conclusion of the conversation, Glaum offered to send Wolf a small shipment of marijuana.

On January 30, 2001, Wolf and Glaum negotiated the smaller shipment that they had initially discussed on January 24th. Glaum agreed to send Wolf a ten-pound load. Wolf, in turn, rented a "mail drop" box to receive the shipment at a Mail Boxes Etc. in Saco, Maine. On February 10, 2001, Wolf provided the address to Glaum, and Glaum told him to expect the drugs to arrive in a package appearing to contain candles.

On February 13, 2001, Glaum and Wolf again discussed the ten-pound shipment. This time they discussed payment. Wolf agreed to send half of the money immediately and to pay the rest when they met. In their next conversation, on February 18, 2001, they discussed the possibility of a larger shipment. Glaum offered to send a sample of the larger shipment or to bring it to Maine when he visited Kerrigan. He told Wolf that he had just obtained "three hun[dred]" pounds of marijuana and that the drugs were "Dad's thing" and were "all Dad."

Wolf received the ten-pound shipment on February 20, 2001. Wolf called that day to inform Glaum that the shipment had arrived. The next conversation between Wolf and Glaum took place on February 22, 2001, during which Wolf told Glaum that Martino was "kinda anxious" about the larger deal.

-6-

At this point, Wolf arranged for DEA Agent Ralph Caruso to pose as Martino, in order to expand the investigation. On February 25, 2001, Wolf told Glaum that he had shared some of the ten-pound shipment with Martino and that, as a result, Martino wanted to meet to finalize the deal. Wolf asked Glaum if he could give Martino his telephone number. Glaum agreed.

The investigation then shifted to San Diego. Caruso and DEA Agent Judy Gustafson, who was posing as Martino's girlfriend, met with Glaum on February 29, 2001. Glaum told Caruso that he had arranged to transport the drugs. At their next meeting on March 1, 2001, Glaum insisted that Caruso provide immediate payment for the one-ton shipment.[2] The DEA was unwilling to provide such a large payment to Glaum and accordingly shifted its focus to Gagnon, in the hope that it could arrange the Martino deal through him. After numerous attempts over several months, the agency abandoned this effort because Gagnon refused to take a "proactive" role in organizing the deal.

Because Caruso was unable to make progress through either Glaum or Gagnon, the DEA decided that Wolf should reinitiate contact with Glaum, and on July 16, 2001, Wolf placed a call to Glaum. During this call, Wolf asked Glaum about obtaining new

---

[2] During this meeting, Glaum admitted that he had been smuggling marijuana from Mexico since he was eighteen years old and that he had sent "300 or 400 hundred in the mail without any problems."

shipments of marijuana.  Glaum stated that he had quality marijuana available but that he was upset that he had not been paid for earlier shipments to Maine.  He also said that he had a new person working in Bangor, Maine to oversee some of his affairs.

Wolf and Glaum proceeded to discuss the logistics for sending smaller shipments.  Glaum suggested sending forty-pound lots on the same day to two different addresses.  He said that he had been shipping between 400 and 500 pounds of marijuana every two weeks and that, in some weeks, he had sent 600 pounds.  Glaum also explained that he had formed a shipping company called "Simply Shipping" through which he trafficked drugs.  Glaum noted that his associate in Bangor, Eugene Monroe, had "probably about a hundred pounds of marijuana" on hand, and suggested that Wolf meet with him to set up a deal.

### D. "Dealing" with Monroe

The day after Wolf's conversation with Glaum, he received an electronic page from Monroe.  Monroe explained to Wolf that he was working with Glaum and that, going forward, Glaum wanted Monroe and Wolf to handle "the account" themselves.

On July 24, 2001, Monroe met Wolf at a restaurant in Waterville, Maine.  Monroe said that Glaum had taken over the business after Salsberry was incarcerated.  He also explained that, because of difficulties that Glaum had encountered working with Ronnie Kerrigan, Glaum had hired him to oversee the Maine

-8-

operations.  Monroe described the method for shipping the drugs. The drugs would arrive from Simply Shipping in boxes with religious logos so as to dampen suspicions about their contents.  Wolf provided Monroe with an address at a Mail Boxes Etc. in Scarborough, Maine, where Glaum could send the drugs.  Monroe showed Wolf a sample of the available marijuana.  After seeing the sample, Wolf placed an order for 100 pounds.  Monroe responded that, prior to delivering such a large amount, he would have to check on availability with Glaum.

Later that day, Monroe contacted Wolf and told him that, even though Glaum had 120 pounds of marijuana in his possession, only forty pounds were available to him.  Monroe said that he would bring twenty five pounds to the same restaurant where they earlier had met and that Glaum would ship the rest.

On the afternoon of July 25, 2001, Monroe and Wolf met in the restaurant parking lot.  Monroe placed the drugs in the backseat of Wolf's car.[3]  The next morning, Wolf received a call from the Mail Boxes Etc. informing him that he had received two boxes from "Faith Unity World Service" sent by Simply Shipping. Both boxes contained vacuum sealed bricks of marijuana.

After receiving the shipment, Wolf called Monroe to tell him that it had arrived.  Monroe stated that Glaum had just received another 400 pounds of marijuana to distribute.  On July

---

[3]  Monroe delivered only twenty pounds of marijuana.

-9-

30, 2001, Monroe and Wolf made plans for Wolf to receive an additional twenty five pounds of drugs. The two agreed to meet in Brunswick, Maine, the following day. Monroe was arrested just as Wolf arrived at the meeting spot. At approximately the same time, Glaum was arrested in San Diego.

### E. Trial and Sentence

Glaum was charged in a single-count indictment with conspiracy to distribute and to possess with the intent to distribute 1,000 or more kilograms of marijuana, see 21 U.S.C. §§ 846 and 841(a)(1). After a five-day trial, the jury convicted Glaum but specifically found that he was responsible for only between 100 and 999 kilograms of marijuana. At sentencing, however, the district court determined that Glaum was responsible for 1,052 kilograms of marijuana. The court sentenced Glaum to 121 months of imprisonment and four years of supervised release. Glaum timely appealed from the conviction and sentence.

## II. Discussion

Glaum raises six main issues on appeal. First, he claims that the government failed to prove his participation in the single conspiracy alleged in the indictment. Second, he claims that he was entrapped. Third, he claims that the district court incorrectly instructed the jury on his entrapment defense. Fourth, he claims that the district court erred in its drug quantity calculations. Fifth, he claims that a portion of the drug quantity

-10-

attributed to him should have been excluded because of sentencing manipulation. Sixth, he claims that the district court erred by declining to grant him credit for acceptance of responsibility. We address these claims seriatim.

### A.    Single Conspiracy

Glaum argues that the government failed to prove that he was involved in the single conspiracy described in the indictment. The indictment alleged that, from the fall of 2000 until his arrest, on July 31, 2001, Glaum participated in a single conspiracy with Salsberry and others to distribute marijuana. Glaum asserts that the evidence established two separate conspiracies. The first involved Salsberry and concluded when Salsberry agreed to become a government agent; the second involved Monroe and concluded when Glaum was arrested.

Whether a given body of evidence proves one conspiracy or multiple conspiracies is an issue of fact. See United States v. Portela, 167 F.3d 687, 696 (1st Cir. 1999). Thus, on appeal, we review the jury's single-conspiracy determination by asking whether the finding was rational given the evidence. Id. We have identified a non-exclusive list of factors to guide this inquiry: (1) was there evidence of a common purpose? (2) were the various elements of the plan interdependent? and (3) was there some degree of overlap among the participants? See United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001); Portela, 167 F.3d at 695.

-11-

Here, there was sufficient evidence to find Glaum guilty of participating in the charged single conspiracy. There was evidence that, in the fall of 2000, Glaum conspired with Salsberry to sell drugs. See Portela, 167 F.3d at 695 (goal of selling drugs for profit satisfies common goal requirement). After agreeing to join with Salsberry, Glaum performed several acts to further the goals of the conspiracy, including weighing and preparing drugs for shipment and sale and meeting with Salsberry's suppliers. Following Salsberry's arrest, Glaum agreed to assume Salsberry's role in the business and proceeded to honor this agreement, unaware that Salsberry had agreed to become a government agent.

Glaum contends that the charged conspiracy ended when Salsberry became a government agent. See id. at 699-700 (explaining that a conspiracy cannot exist where one of the members is a government agent because a conspiracy requires the existence of two "genuine" parties). But the Portela rule has no relevance here because there was evidence that Glaum continued to work with other members of the conspiracy after Salsberry agreed to cooperate with the DEA. See United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987) (noting that the rule providing that government agents do not count as co-conspirators is relevant "only in situations where the conspiracy involve[d] one defendant and a government informer") (internal quotations omitted). For example, Glaum told Wolf that he knew "Dad real well" and that the marijuana in his

possession was "all Dad" and was "Dad's thing." The jury easily
could have concluded that Glaum's statements were references to his
on-going work with the Old Man (whose other alias was "Dad").
There was thus sufficient evidence that Glaum continued to receive
marijuana from the supply end of the conspiracy after Salsberry's
departure from the organization.

There was also sufficient evidence to conclude that Glaum
continued to work with the distribution end of the conspiracy. In
conversations with Wolf, Glaum described his continued work with
Ronnie Kerrigan, including his plans to travel to Maine to bring
him drugs. In addition, Eugene Monroe testified that Glaum ushered
him into the conspiracy only after Glaum encountered difficulties
working with Kerrigan. Glaum's continuing relationship with
Kerrigan permitted the jury to conclude that he continued to deal
with distributors that he had met through his involvement in the
charged single conspiracy.[4]

**B.     Entrapment**

Glaum's second claim challenges the jury's decision to
reject his entrapment defense. Like the single-conspiracy issue
discussed above, we review this claim under the sufficiency of the

---

[4]  Glaum also argues that his conviction must be overturned
because the jury found him responsible for a smaller amount of
marijuana than was alleged in the indictment. There is no merit to
this argument. The amount of drugs for which a defendant is
responsible is not an element which the government must prove to
obtain a conviction. See United States v. Goodine, 326 F.3d 26,
32-33 (1st Cir. 2003).

evidence rubric.  See United States v. LaFreniere, 236 F.3d 41, 45 (1st Cir. 2001).  Thus, we consider the evidence in the light most favorable to the government, asking whether a rational jury could have rejected Glaum's entrapment defense.  United States v. Tom, 330 F.3d 83, 89 (1st Cir. 2003).

The entrapment defense is two-pronged.  It requires proof of (1) improper government inducement to commit the crime, and (2) lack of predisposition by the defendant to engage in criminal conduct.  See United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998).  To present an entrapment defense, the defendant must make an initial prima facie showing of proof raising the issue.  See Tom, 330 F.3d at 89.  It is undisputed that Glaum made this initial showing.

At this point, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was not entrapped.  Id.  Sufficient evidence that the government did not improperly induce the crime or that the defendant was predisposed towards criminal conduct defeats the entrapment defense.  See United States v. Capelton, 350 F.3d 231, 242 (1st Cir. 2003).  We focus here on predisposition, considering: (1) the character or reputation of the defendant; (2) whether the initial suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant showed reluctance to commit the offense; and (5) the

-14-

nature of the inducement offered by the government.  See United States v. Nishnianidze, 342 F.3d 6, 17 (1st Cir. 2003).

Here, there was evidence to support the conclusion that Glaum was predisposed to criminal conduct.  Glaum emphasized to the DEA agents his prior work distributing drugs, including that he had been distributing marijuana, imported from Mexico, since he was eighteen years old.  He also had been working with Salsberry in packaging and distributing drugs for several months before the DEA's involvement, and had agreed to run the trafficking business in Salsberry's absence.  Thus, there was ample evidence showing that Glaum had the character and reputation of a drug dealer.  See United States v. Panet-Collazo, 960 F.2d 256, 259-60 (1st Cir. 1992) (statement by defendant that he "worked with cocaine a lot" shows defendant's predisposition to engage in criminal conduct).

In addition, after the DEA infiltrated the conspiracy, Glaum continued to act as an eager participant.  After receiving Wolf's pager number from Salsberry, Glaum contacted Wolf almost immediately and, in their first conversation, offered to do "some business."  Thereafter, Glaum never expressed reluctance to work with Wolf in organizing additional transactions because of their illegality.  Moreover, the evidence that Glaum received "a percentage" of the profits from Salsberry leaves little doubt that Glaum engaged in drug dealing for profit.

## C.    Entrapment Instruction

Glaum next claims that, even if the evidence was sufficient to defeat his entrapment defense, the district court incorrectly instructed the jury on entrapment.  Relying on United States v. Brooks, 215 F.3d 842, 845 (8th Cir. 2000), Glaum argues that the jury should have been instructed that, for purposes of entrapment, the government was responsible for all of Salsberry's conduct whether or not it was aware of the conduct.

In formulating its instructions, a district court is not required to parrot the language proffered by the parties.  See United States v. Nivica, 887 F.2d 1110, 1124 (1st Cir. 1989). Within wide margins, the district court retains the choice of the precise words to be used in explaining the applicable law to the jury.  See United States v. Paniagua-Ramos, 251 F.3d 242, 245 (1st Cir. 2001).  Our role is to determine "whether, taken as a whole, the court's instructions fairly and adequately submitted the issues in the case to the jury."  Tom, 330 F.3d at 91.

The district court instructed that "[t]o show that [Glaum] was not entrapped the government must establish beyond a reasonable . . . doubt that a law enforcement officer or Anthony Salsberry, after he began cooperating with law enforcement, did not persuade or talk [Glaum] into committing the crime." (Emphasis supplied).  The district court also instructed that, for purposes of entrapment, "it does not matter whether the government was aware

-16-

of Anthony Salsberry's communications either directly or indirectly with [Glaum]."  The court's instruction captured the essence of the instruction requested by Glaum.  There was no error.  See United States v. Dray, 901 F.2d 1132, 1141 (1st Cir. 1990).

### D. Drug Quantity Calculation

Glaum's fourth claim of error is that the district court credited unreliable evidence in coming to its drug quantity calculation.[5]  Notwithstanding the jury's determination that Glaum was responsible for less than 1,000 kilograms of marijuana, the court concluded that he was responsible for 2,320 pounds (1,052 kilograms) of marijuana.  In reaching this total, the district court relied, inter alia, on statements by Glaum that (1) he had 300 pounds of marijuana in his possession on February 18, 2001, (2) he dealt between 400 and 500 pounds of marijuana every two weeks (the court took the minimum possible amount of 800 pounds for a single two-week period), (3) in some weeks, he distributed up to 600 pounds, and (4) that Monroe had approximately 100 pounds

---

[5]  In addition, Glaum contends that Apprendi v. New Jersey, 530 U.S. 466 (2000), forbids the district court from sentencing him for drug quantities in excess of the quantity found by the jury. He acknowledges that we have previously rejected this argument, see United States  v. Lopez-Lopez, 282 F.3d 1, 22 (1st Cir.), cert. denied, 536 U.S. 949 (2002); United States v. Martinez-Medina, 279 F.3d 105, 122 (1st Cir.), cert. denied, 537 U.S. 921 (2002), but urges us to reconsider.  We decline his invitation. See United States v. Rodriguez, 311 F.3d 436, 438-39 (1st Cir. 2002), cert. denied, 123 S.Ct. 1607 (2003). Relatedly, Glaum asks us to declare 21 U.S.C. § 841 facially unconstitutional because it conflicts with Apprendi.  We also rejected this argument in Lopez-Lopez, 282 F.3d at 22-23, and will not reconsider it here.

-17-

available on July 16, 2001. The court also relied on statements from Monroe that Glaum had 120 pounds in his possession on July 24, 2001 and another 400 pounds in his possession on July 25, 2001.

The district court determines drug quantity under a preponderance of the evidence standard. See United States v. Laboy, 351 F.3d. 578, 582 (1st Cir. 2003). We disturb a drug quantity determination only in cases of clear error. See United States v. Batista, 239 F.3d 16, 21 (1st Cir. 2001). In cases such as this, where "the amount [of drugs] seized does not represent the scale of the offense, the court. . . approximate[s] the quantity of the controlled substance." U.S.S.G. § 2D1.1, cmt. (n.12). In making such a determination, the district court need only make "a reasoned approximation" of the quantity involved. United States v. Huddleston, 194 F.3d 214, 224 (1st Cir. 1999).

As set forth above, the district court relied on statements made by Glaum and Monroe during the course of the DEA's investigation. We recently observed that "the most damning evidence of drug quantity [is] the defendant's own admissions." United States v. Cyr, 337 F.3d 96, 100 (1st Cir. 2003). In any event, the court acted reasonably in crediting Monroe's and Glaum's admissions. Glaum has simply not offered a substantial reason for upsetting the district court's primary role in making credibility determinations. See United States v. Picanso, 333 F.3d 21, 27 (1st Cir. 2003) ("The appraisal of amount depends on inference drawing

-18-

and . . . credibility and we are not only loath but forbidden to substitute our own de novo assessment for that of the judge who tried the case and heard the evidence first hand."); Huddleston, 194 F.3d at 224 (noting, in context of reviewing district court's drug quantity calculation, that "credibility calls are grist for the trial court mill").[6]

### E. Sentencing Manipulation

Glaum next claims that some portion of the drugs should have been excluded from the quantity calculation because of sentencing manipulation. Specifically, he claims that government agents, including Salsberry, coerced him to participate in additional deals in order to increase his sentence.

"[W]here government agents have improperly enlarged the scope or scale of the crime, the sentencing court has ample power to deal with the situation . . . by excluding the tainted transaction from the computation of relevant conduct." United States v. Montoya, 62 F.3d 1, 3 (1st Cir. 1995) (internal quotations and citations omitted) (emphasis in original). However, to prevail on a sentencing manipulation claim, the defendant must establish "extraordinary misconduct by the government." Id. at 4

---

[6] Additionally, Glaum argues that the district court erroneously relied on drug quantities from both the "first" conspiracy involving Salsberry and the "second" conspiracy involving Monroe in reaching the total. Our conclusion that the evidence supported the jury's determination that there was only one conspiracy disposes of this argument. See supra, at 11-13.

(internal quotations and citations omitted). "[G]arden variety manipulation claims" do not suffice. Id.

The district court rejected Glaum's sentencing manipulation claim because the DEA's continued pursuit of Glaum permitted the DEA to further infiltrate the conspiracy. The court's analysis was reasonable. We have rejected sentencing manipulation claims where the government extended the scope of its investigation into the defendant's conduct because it reasonably believed that further investigation would permit it to identify additional drug dealers. See Capelton, 350 F.3d at 246 (rejecting sentencing manipulation claim where government extended investigation in order to identify additional drug dealers); United States v. Terry, 240 F.3d 65, 71 (1st Cir. 2001) (rejecting sentencing manipulation claim where government acted in good faith when it extended duration of investigation to identify other members in drug network). So too here, as the government's efforts resulted in Monroe's arrest.[7]

---

[7] Glaum also argues that he was predisposed to commit only small drug transactions and that the DEA manipulated him into attempting larger transactions. We are unpersuaded. Evidence concerning the defendant's predisposition is of marginal relevance to a sentencing manipulation claim. See Montoya, 62 F.3d at 4. In any event, Glaum's attempt to cast himself as a small-time drug dealer until the DEA's investigation is not the only (or even the most plausible) reading of the record. The evidence showed that, prior to the DEA investigation, Glaum worked to organize transportation of a one-ton shipment of marijuana.

## F. Acceptance of Responsibility

Finally, Glaum claims that the district court erred by refusing to grant him a reduction in his sentence for acceptance of responsibility. See U.S.S.G. § 3E1.1. He contends that he is entitled to such a reduction because, before trial, he admitted responsibility for the offense of which he was eventually convicted.

Glaum was initially indicted for participating in a conspiracy involving 100 or more kilograms of marijuana. Subsequently, a superseding indictment was issued charging Glaum with participating in a conspiracy involving 1,000 or more kilograms of marijuana. After this superseding indictment was issued, Glaum offered to plead guilty to the original charge. The government refused this offer. Glaum contends that, because the jury found him guilty only of the original charge, he should receive credit for accepting responsibility. The district court rejected this argument because it found Glaum responsible for over 1,000 kilograms of marijuana, and Glaum denied responsibility for these additional quantities.

To earn an acceptance of responsibility reduction, a defendant must, inter alia, "truthfully admit the conduct comprising the offense of conviction." See U.S.S.G. § 3E1.1 cmt. (n. 1(a)). In addition, he must "truthfully [admit] or not falsely [deny] any additional relevant conduct for which [he] is

-21-

accountable." Id.; see also United States v. Hernandez Coplin, 24 F.3d 312, 317 (1st Cir. 1994). The district court's rejection of an acceptance of responsibility claim is entitled to considerable deference and can be overturned only on a showing of clear error. See Capelton, 350 F.3d at 245.

Throughout the presentence process, Glaum denied responsibility for the relevant conduct attributed to him by the district court. At his sentencing, he told the court that "[w]hat they're saying I did, that's a crock of crap." Glaum's comment is certainly not indicative of a criminal defendant accepting responsibility for his conduct. See U.S.S.G. § 3E1.1 cmt. (n. 1(a)) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); see also United States v. Gonzalez, 12 F.3d 298, 300 (1st Cir. 1993).[8] Because Glaum persisted in denying his participation in a conspiracy involving 1,000 or more kilograms of marijuana, the district court's rejection of his acceptance of responsibility request was not clearly erroneous.

---

[8] Glaum's decision to pursue an entrapment defense is also inconsistent with acceptance of responsibility. See Capelton, 350 F.3d at 245 (noting that acceptance of responsibility reduction will rarely be appropriate where defendant pursues entrapment defense).

## III. <u>Conclusion</u>

For the reasons set forth above, we **<u>affirm</u>** the conviction and sentence of defendant Terrence Glaum.