# United States Court of Appeals
## For the First Circuit

No. 06-1880

UNITED STATES OF AMERICA,

Appellee,

v.

ALTAGRACIA RAMOS-PAULINO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Lynch, Circuit Judge.

Raymond L. Sanchez-Maceira, by appointment of the court, on brief for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney (Chief, Appellate Division), Rosa Emilia Rodríguez-Vélez, United States Attorney, and on brief for appellee.

May 23, 2007

**SELYA**, **Senior Circuit Judge**.  In this criminal appeal, the defendant challenges both her conviction (on the ground of instructional error) and her sentence (on the ground of a guidelines-related error).  After a thorough review of the record and the applicable law, we affirm the defendant's conviction but vacate her sentence.  The tale follows.

We begin with the denouement.  In April of 2005, a federal grand jury charged defendant-appellant Altagracia Ramos-Paulino with attempted transport and concealment of illegal aliens, see 8 U.S.C. § 1324(a)(1), and trafficking in false identification documents, see 18 U.S.C. § 1028(a)(2).  These charges stemmed from her involvement with Rafael Cintrón-Brea (Cintrón), a defrocked police officer who became a government informant after pleading guilty to an alien-smuggling charge.

The pertinent facts are as follows.  The defendant first met Cintrón in 2003.  While she piously protests that they did not pool their efforts to transport illegal aliens until January of 2005, Cintrón says that they collogued together from the start.  We need not resolve this conflict; for present purposes, it suffices that, by all accounts, the joint enterprise was velivolant no later than January of 2005.  An event that is crucial to this appeal occurred at that time: Cintrón reassured the defendant that, notwithstanding his earlier arrest (of which she had recently

become aware), she would not be brought to book for the criminal activities that the two of them were planning to undertake.

This brings us to the offense conduct. Between January and April of 2005, Cintrón and the defendant arranged the transport of four illegal aliens. The defendant was the principal contact for the aliens. With the assistance of a man named Domingo, she gathered information about them, collected payments from them, and obtained false identification documents for them. She then transferred the money, the papers, and the aliens to Cintrón with directions about which airline tickets should be purchased.

According to the plan, Cintrón was to purchase the tickets and escort the aliens through San Juan's major international airport, bypassing the usual security checkpoints. Cintrón, however, was cooperating with the authorities, and the defendant's activities led only to her arrest. An indictment followed.

Pretrial proceedings were unremarkable. Cintrón was the government's star witness at the trial. At the close of the evidence, the defendant renewed her earlier request for an entrapment instruction, claiming that Cintrón's assurances had induced her to participate in the criminal venture. The district court refused to instruct on entrapment, and the jury found the defendant guilty on all counts.

The district court continued the case for sentencing and ordered the preparation of a presentence investigation report (PSI Report). The court convened the disposition hearing on April 25, 2006. In making its guideline computations, the court adopted a recommendation put forth in the PSI Report and applied a two-level enhancement based on the defendant's role in the offenses of conviction. See USSG §3B1.1(c). The adjusted offense level, when combined with the defendant's criminal history category, yielded a guideline sentencing range of 15-21 months. The court proceeded to impose a sentence at the top of the range: 21 months. This timely appeal ensued.

The defendant's claim of instructional error is easily dispatched. She argues that she was entitled to a jury instruction on entrapment because that was her main theory of defense and the record contained adequate evidence to support it. We do not agree.

It is often said that a criminal defendant is entitled to have the jury instructed on her theory of the case. But that aphorism is not a universal truth: to warrant a jury instruction on a specific theory of defense, the evidence adduced at trial, taken in the light most flattering to the accused, must plausibly support the theory. See United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998); United States v. Rodriquez, 858 F.2d 809, 812 (1st Cir. 1988).

Where, as here, a criminal defendant seasonably requests an instruction on a particular theory of the case and the trial court flatly refuses to submit that theory to the jury, our review is plenary. See United States v. Nishnianidze, 342 F.3d 6, 17 (1st Cir. 2003); Rodriquez, 858 F.2d at 812. This strain of appellate review does not permit differential factfinding but, rather, turns upon an inquiry into the sufficiency of the evidence in the case. Rodriquez, 858 F.2d at 812. The burden is on the defendant, as the proponent of the theory, to identify evidence adduced during the trial that suffices to satisfy this standard. See id. at 814.

We have had occasion to apply this framework to efforts to deploy an entrapment defense. When that defense is in issue, the test of evidentiary sufficiency has two facets. See United States v. Capelton, 350 F.3d 231, 242 (1st Cir. 2003). To warrant an instruction on entrapment, the evidence must be sufficient to support both a finding that the government wrongfully induced the unlawful conduct and a finding that the defendant lacked a predisposition to engage in that conduct. See, e.g., United States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994); Rodriquez, 858 F.2d at 814. The defendant cannot pass this binary test.

Here, the claim of inducement rests exclusively on the January 2005 conversation between Cintrón and the defendant. As the defendant envisions it, Cintrón lured her into committing the crime by assuring her that "nothing could happen to her because he

was a Police Officer."  Appellant's Br. at 11.  In our view, however, this solitary piece of evidence leaves the defendant well short of the finish line.

We repeatedly have held that the simple solicitation of a criminal act or the mere provision of an opportunity to engage in one does not meet the threshold requirement for a finding of wrongful inducement.  See, e.g., Capelton, 350 F.3d at 243; Gifford, 17 F.3d at 468.  Empty promises that a crime, once committed, will produce no adverse repercussions fall into the same category.  Telling a person that she will not be caught does not lead her to believe that the conduct is lawful or that she will be in jeopardy if she refuses to go along; it is, rather, simply a way of making the opportunity to commit the crime more attractive.  Such promises, therefore, are not the stuff of which inducement can be fashioned. See United States v. Evans, 924 F.2d 714, 717 (7th Cir. 1991) (stating that inducement will lie only when the government offers the "sorts of promises that would blind the ordinary person to his legal duties"); cf. United States v. Davis, 15 F.3d 902, 909 (9th Cir. 1994) (explaining that law enforcement officers "are not precluded from utilizing artifice and stealth" to apprehend criminals, provided that "they merely afford opportunities or facilities for the commission of the offense by one predisposed or ready to commit it").  Inducement requires something more — something akin to excessive pressure, threats, or

the exploitation of an unfair advantage.  See United States v. Luisi, 482 F.3d 43, 58 (1st Cir. 2007); United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994) (Breyer, C.J.).

In this instance, the defendant's version of her conversation with Cintrón is uncontradicted.  Taking what was said at face value, a finding of inducement simply will not lie.  On that basis alone, the district court's unwillingness to instruct on entrapment was entirely appropriate.[1]

We turn next to the defendant's claim of sentencing error.  The Supreme Court's landmark decision in United States v. Booker, 543 U.S. 220, 245 (2005), rendered the federal sentencing guidelines advisory.  This does not mean, however, that the guidelines are irrelevant in the post-Booker world.  To the contrary, they remain the starting point for most federal sentencing determinations.  See United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006); United States v. Jiménez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007).  When an error in the calculation of a defendant's guideline range affects or arguably affects the sentence imposed, that error will require resentencing.  See United States v. Gobbi,

---

[1]Because the absence of any significantly probative evidence of inducement is dispositive of the claim of instructional error, we need not address the state of the record vis-à-vis predisposition.  See Capelton, 350 F.3d at 242-43 ("Given the disjunctive nature of the [entrapment] test, we can fulfill our appellate function by elaborating our disagreement on either inducement or predisposition.").

471 F.3d 302, 313 & n.7 (1st Cir. 2006); United States v. Antonakopoulos, 399 F.3d 68, 81 (1st Cir. 2005).

We review a sentencing court's findings of fact for clear error. See United States v. Misla-Aldarondo, 478 F.3d 52, 70 (1st Cir. 2007); United States v. Dixon, 449 F.3d 194, 200-01 (1st Cir. 2006). We afford de novo review, however, to questions of law involved in sentencing determinations. See United States v. Pho, 433 F.3d 53, 60-61 (1st Cir. 2006). A question about whether the evidence is sufficient to support a particular guideline determination is a question of law and, therefore, engenders de novo review. See Dixon, 449 F.3d at 200; United States v. Carrasco-Mateo, 389 F.3d 239, 243 (1st Cir. 2004).

In the case at hand, the defendant makes a rifle-shot objection to one part of the lower court's sentencing algorithm. This objection takes dead aim at the court's embrace of a two-level upward adjustment for role in the offense recommended in the PSI Report. The operative guideline provision applies to a defendant who is shown by a preponderance of the evidence to be an "organizer, leader, manager, or supervisor" of between one and five other participants in the crime of conviction. USSG §3B1.1(c); see United States v. Tejada Beltran, 50 F.3d 105, 110 (1st Cir. 1995).

The defendant's argument centers on the paucity of evidence that she organized, led, managed, or supervised any other participant in the criminal enterprise. Because the district court

-8-

did not base the enhancement on specific findings as to whom the defendant may have organized, led, managed, or supervised, we have searched the record (including the PSI Report) in an endeavor to identify any such underlings.

We have come up dry. The district court indicated at one point its belief that the defendant oversaw Cintrón. Even if that were true — and the record is murky on the point — such a finding could not sustain the enhancement. For purposes of the "participant" requirement of section 3B1.1(c), Cintrón (who was acting undercover in 2005 as part of a government sting operation) does not count. Neither a government agent nor anyone acting under the direction of a government agent qualifies as a "participant" for purposes of a role-in-the-offense enhancement. See USSG §3B1.1 cmt. n.1; see, e.g., United States v. Andreas, 216 F.3d 645, 679 (7th Cir. 2000); United States v. King, 21 F.3d 1302, 1304-05 (3d Cir. 1994). By the same token, the aliens themselves cannot be deemed participants for this purpose. See United States v. Thiongo, 344 F.3d 55, 63 (1st Cir. 2003); see also USSG § 2L1.1 cmt. n.2.[2]

Beyond the defendant's relationship with Cintrón and her dealings with the aliens themselves, there is little if any

_____

[2]It is conceivable, of course, that the aliens might qualify as participants for the purpose of a role-in-the-offense enhancement with respect to the "false document" count. See Thiongo, 344 F.3d at 62-63. Here, however, the district court made no findings to that effect.

evidence indicating that she organized, led, managed, or supervised any other participant. Although she worked hand in glove with the mysterious Domingo, there is nothing to show either that he was her subordinate in the chain of command or that she oversaw his activities.

The absence of any such evidence is puzzling, but the record contains a likely explanation. In fashioning the managerial role enhancement, the district court seems to have gone in a different direction. For aught that appears, the court based the enhancement primarily on the defendant's control over the <u>activities</u> of the criminal enterprise rather than over any <u>participants</u> in it.

To justify this focus, the court pointed to language in the guidelines discussing "a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." USSG §3B1.1 cmt. n.2. That description, the court said, "fit[] very well to this defendant's role." Elaborating, the court observed that the defendant was the principal contact for the smuggled aliens, that she was apparently responsible for determining fees and accepting payments, that she procured the false identification documents, and that she had some influence over the scheduling of the transports.

We appreciate the district court's concern. The problem with this approach, however, is that the very application note cited by the court makes it pellucid that the management of criminal activities (as opposed to the management of criminal actors) may ground an upward departure but not an upward role-in-the-offense adjustment. See id. Although both may lead to similar outcomes, there is an important structural distinction between sentencing enhancements and sentencing departures. See United States v. Cali, 87 F.3d 571, 576-79 (1st Cir. 1996); see also USSG §1B1.1 cmt. n.1(E) (defining departures generally). For present purposes, then, we are constrained by the unambiguous case law holding that management of criminal activities, standing alone, does not constitute a basis for a role-in-the-offense enhancement under section 3B1.1. See, e.g., United States v. Harness, 180 F.3d 1232, 1235 (11th Cir. 1999); Cali, 87 F.3d at 876-79; United States v. Greenfield, 44 F.3d 1141, 1146 (2d Cir. 1995). Consequently, the district court erred in upwardly adjusting the defendant's offense level on the basis of section 3B1.1(c).

Even under an advisory guidelines regime, the sentencing court is obliged to calculate the guideline range correctly. See Gobbi, 471 F.3d at 313 & n.7. An accurate calculation of the range is particularly important where, as here, the district court sentences the defendant at the range's apex. Accordingly, we have no principled choice but to vacate the defendant's sentence and

-11-

remand for resentencing consistent with this opinion.  We leave open the full gamut of possibilities — for example, the district court, if it can identify a participant or participants under the defendant's sway, may reimpose the managerial role enhancement; or it may essay an upward departure for management of criminal activities; or it may simply eschew any further embellishments and impose what it deems to be a reasonable sentence.  We take no view either as to the course to be followed or as to the duration of the sentence to be imposed.  In the first instance, these are matters for the sentencing court.

We need go no further.  For the reasons elucidated above, we affirm the defendant's conviction, vacate her sentence, and remand for resentencing consistent with this opinion.

**Affirmed in part; vacated in part; and remanded for resentencing**.