# United States Court of Appeals
## For the First Circuit

No. 24-1829

UNITED STATES OF AMERICA,

Appellee,

v.

LILIAN GIANG,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

Christine DeMaso, Assistant Federal Public Defender, for
appellant.

Donald C. Lockhart, Assistant United States Attorney, with
whom Leah B. Foley, United States Attorney, was on brief, for
appellee.

April 22, 2026

**MONTECALVO, Circuit Judge.** After a jury trial, Defendant-Appellant Lilian Giang was convicted on four counts of failure to collect or pay over employment taxes in violation of 26 U.S.C. § 7202 and one count of mail fraud under 18 U.S.C. § 1341. Her convictions stem from the operations of Able Temp Agency ("Able"), a staffing business she owned and managed. At trial, the government's witnesses testified that Able paid workers in unreported cash and submitted false payroll information to both the Internal Revenue Service and Able's workers' compensation insurer, resulting in lower tax bills and insurance premiums. On appeal, Giang challenges four aspects of her trial: (1) the admission of evidence about her alleged efforts to skirt cash-withdrawal reporting requirements by withdrawing cash in increments just below the reporting threshold, (2) the district court's refusal to give a requested jury instruction on implicit bias, (3) the propriety of the court's instructions regarding tax obligations and good faith and, finally, (4) the sufficiency of the evidence underpinning her mail fraud conviction. After considering each of the purported errors Giang identifies, we **AFFIRM** the district court.

## I.    BACKGROUND

Because this case comes to us after a jury trial, we recount the facts relevant to the appellant's sufficiency challenge in the light most favorable to the government and provide

a neutral summary of the facts relevant to any other claims.  See United States v. Díaz-Rosado, 857 F.3d 116, 117 (1st Cir. 2017).

## A.  Giang's Business Operations

At the age of twenty, Lilian Giang immigrated to the United States from Vietnam in 1987 after spending time in a refugee camp in the Philippines.  Giang left school in Vietnam during the seventh grade and speaks limited English.  In 1999, Giang and her then-husband purchased a small store in New Hampshire, which they operated together until their divorce around 2013.  After the couple divorced and sold the store, Giang supported their three children on her own.

In 2015, Giang founded Able, a temporary employment business based in Quincy, Massachusetts.  Able provided short-term laborers to client companies throughout the state.  Many of Able's workers were, like Giang, Vietnamese immigrants.  The client companies paid Able, and Able was responsible for paying the workers and handling the attendant payroll tax obligations.

Giang personally managed most aspects of Able's operations, including job placements, worker transportation, and payroll coordination.  She relied on her daughter, Mi Giang Kul, who had formal training in accounting, to enter payroll data into Able's Intuit accounting system.  That accounting system generated worker paychecks, W-2s, and IRS Form 941 quarterly payroll tax

- 3 -

reports.[1]  Giang also used an outside accountant, Wayne Hussey, to prepare tax returns for Able and for her personally, though Hussey did not prepare or file Able's Form 941s.  Hussey explained that Able "was designed not to ever make a profit," but instead passed any profits to Giang as distributions so any profits were reported on her personal income taxes.

### B.    Giang's Cash Withdrawals

Between 2015 and 2019, Giang made 774 cash withdrawals -- over $3.7 million in total -- from bank accounts connected to Able and Giang, many of which were held at Rockland Trust Bank.  Giang testified that she used the cash to pay her workers.

From 2015 through October 2018, Giang never withdrew more than $10,000 at once but often made withdrawals just below that threshold -- sometimes multiple times per day.  The federal Bank Secrecy Act requires banks to report single cash withdrawals over $10,000 to the Department of the Treasury.  See United States v. Morales-Rodríguez, 467 F.3d 1, 10 (1st Cir. 2006) (citing 31 U.S.C. § 5313).  A Rockland bank teller testified that on October 15, 2018, she informed Giang about this reporting requirement after the bank raised concerns internally about Giang's pattern of cash

---

[1] An IRS Form 941 is a quarterly tax return document filed by employers to report the Social Security taxes, income taxes, and Medicare taxes they have withheld from employee paychecks.  United States v. Buoi, 84 F.4th 31, 35 (1st Cir. 2023).

withdrawals. A week after that conversation, Giang began making withdrawals over $10,000 for the first time.

Giang's cash-accounting practices allowed her to underreport Able's payroll and thus avoid over $800,000 in employment taxes. Records from Able's bank accounts showed cash withdrawals that far exceeded Able's reported payroll.

Several of the government's witnesses, including former Able temp workers, Able client representatives, and a DOJ auditor, testified that Able employees were often paid in cash for additional hours beyond what their Intuit-generated paychecks showed, sometimes below minimum wage, and that this extra cash pay was not reported to tax authorities by Able. All of this, according to the government, meant that Giang was not paying the required employment taxes on these cash wages. Giang's accountant testified that Giang told him she was using the cash she withdrew either to pay workers or to pay herself. He explained that, when preparing Giang's taxes, he reported some of those cash-withdrawal expenses as subcontractor costs and some as owner profit, depending on what she told him about the transactions. Giang's daughter testified that her mother never told her that Able was paying its workers using off-the-books cash, personal checks from Giang, or paying them using any other method besides the checks Giang's daughter printed using Able's bookkeeping software.

## C.    Able's Insurance Filings

From 2014 to 2020, Able held a workers' compensation insurance policy issued by Travelers Indemnity Company ("Travelers").[2]  Able's insurance premiums were calculated in part based on its total payroll: employers with larger payrolls generally pay more, while those with fewer employees or lower reported wages pay less.   To compute an insured's premium, Travelers would issue an estimated premium at the start of the policy period.  At the end of the year, Travelers would audit the insured's payroll records and calculate the actual premium owed. To complete those year-end audits, Travelers would solicit payroll data from the insured.

In November of 2018, Travelers mailed Able an "Online Invitation Letter," which asked the policyholder to complete the year-end audit through Travelers' online portal or by mail.  That document explained that Travelers' audit forms and adjustment letters would also be available electronically.  Giang submitted electronically a list of Able's workers and reported payroll.  On December 6, 2018, based on that submission, Travelers determined that Able's actual premium was slightly less than Travelers' start-of-the-policy estimate and sent Giang a premium adjustment letter confirming that Able was due a refund of $802.  But in

---

[2] Massachusetts law requires employers like Able to carry such insurance.

reality, because Giang did not include the cash payments in the payroll data she submitted, Able's real payroll was much higher than reported, and the premium it paid for the 2017-2018 period was about $30,000 less than it would have been had all of Able's payroll been reported.

## II. PROCEDURAL HISTORY

A federal grand jury in the District of Massachusetts returned a five-count indictment against Giang on March 8, 2023. A three-day jury trial was held in April 2024. The jury convicted Giang on all counts. On September 9, 2024, Giang was sentenced to eighteen months' imprisonment followed by two years of supervised release. She timely appealed on September 11, 2024.

## III. DISCUSSION

Giang presses four issues on appeal, which we address in roughly the chronological order in which they arose. First, that the district court should not have admitted evidence about the $10,000 cash transaction reporting requirement because it was irrelevant and prejudicial. Second, that the district court erred by refusing to give her requested instruction on implicit bias. Third, that the district court's instructions on good faith and an employer's tax obligations improperly reduced the government's burden to prove her guilty state of mind. Fourth, and finally, that her conviction for mail fraud was not supported by sufficient

evidence that she used the mail in furtherance of a crime or caused it to be so used.

## A.    Admission of Evidence Related to Structuring

Before trial, prosecutors told Giang that they intended to introduce evidence "that [she] structured cash withdrawals to avoid the filing of Currency Transaction Reports."  "Structuring" one's transactions -- that is to say, deliberately withdrawing or depositing cash in quantities intended to evade the $10,000 cash reporting requirement -- is itself a crime.   See 31 U.S.C. § 5324(a)(3),   (d)(1);   31   C.F.R.   § 1010.100(xx)   (defining structuring).[3]   Giang   was   not   charged   with   structuring   as   a separate offense, but the government sought to introduce her structuring conduct as proof of the crimes with which she was charged.

Giang   then   moved   to   exclude   "any   allegations   of structuring"   as   irrelevant   and   prejudicial.    The   government responded that the evidence was intrinsic to the charged offenses and relevant to Giang's knowledge and intent under Federal Rule of Evidence 404(b).   It promised not to "present evidence or argue that [Giang] had violated any law" against structuring but would

---

[3] In its simplest form, structuring might look like a person who wishes to deposit $45,000 into his bank account without triggering the reporting requirement making five deposits of $9,000 on different days and at different bank branches, rather than just depositing the entire $45,000 in a single transaction. See 31 C.F.R. § 1010.100(xx).

argue that Giang "purposefully withdrew cash in amounts that would not trigger her bank's reporting requirements." Based on this assurance that the government would "not present evidence of or argue restructuring as a discrete violation of law," the district court denied Giang's motion to exclude. Giang objected again at trial when the government presented evidence about the reporting threshold. She argues that admitting the evidence over her objection was error.

Because Giang moved to exclude this evidence before trial and objected at trial too, her objection is preserved, and we review for abuse of discretion. United States v. Santana-Avilés, 120 F.4th 7, 11 (1st Cir. 2024). Giang says the district court abused its discretion by admitting this evidence for three reasons. First, the evidence was entirely irrelevant because it did not show deliberate structuring. Second, even if she deliberately structured her transactions to evade the reporting requirement, she says, such evidence would implicate Rule 404(b)'s prohibition on evidence of prior bad acts. And, she continues, because the government cannot prove that the evidence has the sort of "special relevance" to the charged offense required for admission under that rule, it must be excluded. Finally, Giang tacks on the contention that the evidence was simply too prejudicial and should have been excluded under Rule 403.

- 9 -

Seemingly invoking Rule 104(b), Giang first argues that the evidence was irrelevant because it depended on a fact for which there was insufficient proof -- that she deliberately structured her cash withdrawals to avoid the reporting threshold. Under Rule 104(b), "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Here, we are satisfied that testimony about and records of Giang's transactions sufficiently demonstrated that she deliberately avoided reporting requirements such that the district court did not abuse its discretion by determining that they were at least relevant.

The evidence showed that Giang routinely withdrew cash in amounts just below the $10,000 reporting threshold, sometimes more than once per day. Giang's arguments about whether the evidence supported a conclusion that she did indeed intend to evade the cash transaction reporting requirements go to the weight of that evidence, not its admissibility. See United States v. Weadick, 15 F.4th 1, 18-19 (1st Cir. 2021) (finding that weak evidence of defendant's involvement in drug scams was admissible to show mutual trust among co-conspirators, and that challenges to strength of the evidence went to weight, not admissibility); see also United States v. Walsh, 928 F.2d 7, 10 (1st Cir. 1991) ("The

fact that a benign account of the evidence was plausible . . . does not mean that the evidence could not be introduced.").[4]

Nor are we persuaded by Giang's second argument: that the evidence is inadmissible as prior bad act evidence under Rule 404(b) because it was unconnected to the charged conduct and was unfairly prejudicial. Because the evidence of structuring was "intrinsic" to the charged fraud offenses, Rule 404(b) does not apply in the first place.

Admission of "[e]vidence intrinsic to the crime for which the defendant is on trial . . . is not governed by Rule 404(b)." United States v. Epstein, 426 F.3d 431, 439 (1st Cir. 2005) (citation modified). Such intrinsic evidence includes "prior acts that are 'part of [the] necessary description of the events leading up to the crime[]' or that go to an 'element of the charged offense.'" United States v. Souza, 749 F.3d 74, 84 (1st Cir. 2014) (alterations in original) (quoting United States v. Fazal-Ur-Raheman-Fazal, 355 F.3d 40, 50 (1st Cir. 2004)).

---

[4] That Giang occasionally withdrew more than $10,000 after being told of the reporting rule does not disturb that conclusion. Perhaps Giang modified her behavior once she realized she was under scrutiny from her bank (as the government suggests), or perhaps -- as Giang insists -- she simply withdrew as much cash as she happened to need, which by chance exceeded $10,000 only after she was told of the reporting requirement. That the evidence was subject to multiple plausible interpretations is no reason to exclude it. See United States v. Mehanna, 735 F.3d 32, 65 (1st Cir. 2013).

Our decision in Souza compels the conclusion that Giang's cash withdrawals were intrinsic to the charged offense. There, we explained that a district court did not abuse its discretion by admitting evidence in a structuring case that "the source of the funds that were eventually structured" was uncharged fraudulent activity. Id. at 84-85. That the evidence of the fraud "was part of the necessary description of the events leading up to the structuring," "suggested [the defendant] knew he had obtained the funds in an illicit manner," and finally, spoke to "his intent to evade . . . reporting requirements." Id. at 84.

This same logic applies here, where we face Souza's inverse: evidence of uncharged structuring that is intrinsic to the charged failure to pay taxes. Like in Souza, Giang's frequent cash withdrawals were "part of the necessary description of the events leading up to" her scheme to pay her workers in cash and thus avoid tax and insurance premium obligations. Id. And here, as there, the evidence "provided important additional information with which to evaluate" Giang's intent when it came to the charged tax and mail fraud offenses. Id. at 85. Just as the fraudulent source of the funds in Souza helped explain that defendant's motive for structuring the funds, that Giang seems to have made her withdrawals in increments designed to avoid scrutiny suggests that she knew her cash-payment scheme was unlawful, and her attempts to

avoid triggering cash transaction reports were part of her effort to conceal the cash payments to her workers.

Finally, we are not persuaded by Giang's Rule 403 argument that the evidence of her alleged structuring was so prejudicial that it ought to have been excluded. Because the Rule 403 prejudice-balancing inquiry is a "quintessentially fact-sensitive enterprise," we reverse a district court's Rule 403 determination "only rarely and in extraordinarily compelling circumstances." United States v. Monteiro, 871 F.3d 99, 111 (1st Cir. 2017) (citation modified). Here, the district court did not abuse its discretion by concluding that the evidence of alleged structuring's probative value outweighed its prejudice. For all the reasons just discussed, the evidence provided key context about Giang's scheme and helped support a finding of intent. Giang does not explain why this is the "extraordinarily compelling circumstance" that justifies overturning the district court's Rule 403 determination. Id. (quoting United States v. Mare, 668 F.3d 35, 39 (1st Cir. 2012)). Accordingly, we conclude that the district court did not abuse its discretion by admitting the structuring evidence.

## B.  Jury Instructions

We turn next to Giang's arguments concerning the district court's jury instructions. "A district court's refusal to give a requested instruction is reviewed de novo." United

States v. Figueroa-Lugo, 793 F.3d 179, 191 (1st Cir. 2015). On appeal we ask whether the requested instruction was "(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present [her] defense." United States v. McLellan, 959 F.3d 442, 467 (1st Cir. 2020) (citation modified).

We apply a similar standard to arguments that a given instruction was incorrect; an incorrect instruction "would not warrant overturning the conviction if the potential error in the jury instruction were harmless." Id. at 466. An erroneous instruction that "deals with an essential element of the crime" is harmless if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (citation modified).

We address Giang's requested -- and rejected -- implicit bias instruction before turning to the instructions on the charges.

**1. The District Court's Refusal to Instruct on Implicit Bias**

Before trial, Giang asked for an implicit bias instruction based on model language promulgated by the Massachusetts Supreme Judicial Court. This instruction describes the concept of subconscious biases, urges jurors to deliberate fairly and without prejudice, and includes strategies for avoiding

such biases.  The purpose of the instruction is to guard against "built-in expectations and assumptions . . . even if we are not aware of them and even if we believe we do not have them."[5]  The district court declined to provide that or any other instruction about implicit bias.  Giang repeated her request after the jury instructions were read to the jury, and the district court again declined to include an implicit bias instruction.

Giang contends that the district court erred by refusing to give her requested instruction on implicit bias.  According to Giang, this instruction was important because her defense centered on her identity as a Vietnamese immigrant and non-native English speaker.  Not giving this instruction impaired her defense, she says, because her "identities as a Vietnamese woman, immigrant, and non-native English speaker were central at trial."

The government does not appear to dispute that the Supreme Judicial Court's model instruction is correct as a matter of law, and did not object below to its being given.  But Giang cannot prevail on either of the other two prongs of our test.  We are satisfied that, because of the district court's voir dire questions and instructions, Giang's requested instruction was

---

[5] SJC Model Jury Instructions on Implicit Bias - Preliminary Charge (Sep. 29, 2021), https://www.mass.gov/doc/sjc-model-jury-instructions-on-implicit-bias-preliminary-charge-pdf-sept-29-2021/download [https://perma.cc/TD33-KW6U].

"substantially covered by the charge as rendered." McLellan, 959 F.3d at 467.

For the reasons explained below, we find that although the district court declined to give the Supreme Judicial Court's model instruction, its voir dire questions and instructions substantially covered the same ground as the implicit bias instruction.

First, before sending the jury to deliberate, the court specifically instructed the jurors to disregard any possible prejudice: "You must do your duty as jurors regardless of any personal likes or dislikes, opinions, prejudice, or appeals to sympathy. That means you must decide the case based solely on the evidence that is before you."

Beyond that, besides asking prospective jurors during voir dire whether any had any generalized bias or prejudice that might make it difficult to sit as an impartial juror, the district court specifically inquired about possible bias against Giang because of her identity:

> As you may have observed, Ms. Giang, the defendant, is a naturalized American citizen of Vietnamese origin. She speaks English, but she is not fluent in the legal terms in the course of a criminal case, so she will require, as you can tell, the assistance of an interpreter during the trial.
>
> Is there anything about these facts that might cause any prospective juror to doubt your ability to treat Ms. Giang with the same fair

consideration you would give to any person accused of a crime?

This, taken together, is enough to mitigate the potential bias Giang's requested instruction is supposed to guard against.

We have explained that in the ordinary case, when a trial judge instructs jurors that they must not be swayed "by prejudice, nor sympathy, [nor] personal likes or dislikes," the judge does not commit reversible error by declining to offer a more specific instruction not to consider race, ethnicity, or national origin. See United States v. Díaz-Arias, 717 F.3d 1, 23-24 (1st Cir. 2013) (collecting cases). This is particularly so where the court also conducts a thorough voir dire intended to root out potential bias. Correia v. Fitzgerald, 354 F.3d 47, 53 (1st Cir. 2003) (voir dire questioning on bias coupled with instruction to decide case only on the facts was sufficient to mitigate possible bias); see also United States v. Coleman, 149 F.4th 1, 26-28 (1st Cir. 2025) (no abuse of discretion where trial judge declined to play video for potential jurors on implicit bias but addressed issue with instructions and at voir dire), petition for cert. docketed, No. 25-6945 (U.S. Feb. 27, 2026).

Finally, Giang's arguments about why the lack of such an instruction impaired her defense fall flat.[6] She contends that the failure to give such an instruction "seriously impaired [her] ability to present a defense," McLellan, 959 F.3d at 467, and emphasizes that the government called three unrelated witnesses who all shared a common Vietnamese last name (a fact remarked upon by the prosecutor, who clarified that the witnesses were not related). She adds that one witness also made a statement evincing some degree of racial prejudice: that the witness's wife could communicate with Giang because his wife "speaks Asian." But though these comments may have involved race in a general sense, Giang does not say why the remarks prejudiced her or, if they did, why the district court's instruction to avoid deciding the case based on any bias was insufficient to address them. Nor does Giang explain how the lack of an implicit bias instruction prevented her from presenting her preferred defense: that she spoke little English and did not understand the tax code. In fact, Giang's attorney pressed this argument in opening and closing arguments to the jury and in questions to numerous witnesses, even though Giang's requested instruction was not given.

_____

[6] The parties disagree about whether Giang raised these reasons in the district court. But because they fail under any standard of review, we need not reach that issue.

For all these reasons, we are not persuaded that the district court erred in declining to explicitly instruct the jury on implicit bias.[7]

## 2. Final Jury Instructions

Giang lodges two more arguments against instructions the district court gave when it explained the charges against her. First, she argues that the jury should have been instructed that employment taxes need not be withheld from subcontractor wages -- unlike employee wages. Second, she contends that the instructions on good faith were imprecise and misleading because they equated a lack of good faith with a generalized purpose of deceiving others. We address these issues in turn.

### a. Subcontractor/Employee Distinction

When instructing the jury on the elements of failing to collect or pay federal employment taxes, the district court identified the three elements the government would need to prove:

> First, that Ms. Giang had a duty to collect, account truthfully for, or pay over an employment tax; second, that Ms. Giang knew she had a duty to collect, account truthfully for, or pay over an employment tax; and, third, that Ms. Giang willfully failed to

---

[7] Though we find no error in the district court's decision not to instruct the jury on implicit bias, we do not hold that such an instruction is never warranted. We are confident that, whether through targeted voir dire questions and instructions, as employed here, or through a general implicit bias instruction like the one Giang requested, district courts will continue to remain on guard against possible juror bias, whether conscious or unconscious.

collect, account truthfully for, or pay over the employment tax.

The district court also explained what "employment tax" meant:

An employment tax is a tax imposed by federal law on the wages of individual employees, which includes an income tax, a social security tax, and a Medicare tax. Federal law requires the employer to file with the Internal Revenue Service or IRS, a Form 941, the employer's federal quarterly tax return, and to pay over to the IRS the employment taxes that the employer has collected on a quarterly basis, that is, four times a year. The employer is required to report on the IRS Form [941] the wages that the employer paid its employees that quarter and the employment taxes paid on those wages. Wages include all compensation the employer paid the employee for work performed.

Giang does not say anything in the district court's definition of these elements was wrong. Instead, she contends that some of the trial evidence suggested Giang thought she was paying her workers as subcontractors, and that the court therefore should have also explained in its instructions that someone who hires subcontractors is not required to pay the same kind of employment taxes on those subcontractors' wages as they must pay on employees' wages. Failing to do that, Giang says, prevented the jury from deciding a material issue because if Giang's workers were subcontractors, she would not have had to withhold and pay the same employment taxes on their pay.

As a threshold matter, Giang and the government disagree about what standard of review applies. Giang contends that she

- 20 -

objected to the instruction at trial, and so we should review for abuse of discretion.  The government says that Giang never objected, so plain error should apply.

From our review of the record, it appears Giang brought this issue to the court's attention before and after the jury was charged.  The first time, the court informed the parties that there would be "time to haggle later" over jury instructions.  Although the court interrupted Giang's counsel on her second try as she attempted to lodge her objection to the instructions as given, rendering the request a bit unclear, taking a "practical view of the circumstances," we believe Giang has preserved her claim.  See United States v. Teixeira, 62 F.4th 10, 18 (1st Cir. 2023).  At bottom, the court's responses to Giang's attempts reveal that it properly understood Giang's objection, and we thus find Giang's claim of error preserved for appellate review.  See United States v. Castillo, 981 F.3d 94, 102 (1st Cir. 2020).

We review preserved claims of instructional error "under a two-tiered standard: we consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on controlling issues." United States v. Jadlowe, 628 F.3d 1, 14 (1st Cir. 2010) (citation modified).  Giang's contention that the district court erred when it failed to give her requested subcontractor instruction and

thereby prevented the jury from deciding a material issue raises a legal question, so we review de novo.  See United States v. Powers, 702 F.3d 1, 9 (1st Cir. 2012); see also United States v. Ramos-Paulino, 488 F.3d 459, 461 (1st Cir. 2007) ("Where, as here, a criminal defendant seasonably requests an instruction on a particular theory of the case and the trial court flatly refuses to submit that theory to the jury, our review is plenary.").

A district court is required to instruct the jury "on a defense theory only if the evidence provides some foundation for it."  United States v. Angiulo, 897 F.2d 1169, 1206 (1st Cir. 1990) (citation modified).  But "[t]he burden is on the defendant, as the proponent of the theory, to identify evidence adduced at trial that suffices to satisfy this standard."  Ramos-Paulino, 488 F.3d at 462.  We "take the evidence in the light most favorable to the defendant, to see if the inferences and evidence can plausibly support the theory of the defense."  Powers, 702 F.3d at 9.  Here, after reviewing the evidence underlying Giang's subcontractor-distinction theory, she has fallen "short of the finish line."  Ramos-Paulino, 488 F.3d at 462.

Giang's theory that the jury should have been instructed that "[i]f the cash payments had been made to subcontractors, she would not have had a duty to pay employment taxes on them," is minimally supported by the fact that Able's 2017 Depreciation and Amortization Form lists $1,185,913 in "Subcontracted Services" as

a deductible business expense, suggesting that some of Giang's workers may have been subcontractors, not employees. But all the remaining evidence adduced at trial on that topic contradicts her theory and, thus, justifies the district court's decision not to give the subcontractor instruction.

Giang testified that she paid her workers a lower hourly rate in cash because she would keep the residual money to pay employment taxes at the end of the year -- meaning that she did not think she was paying subcontractors who would be paying those employment taxes themselves. Giang also testified that she (with her daughter's help) told Travelers that Able did not use any subcontractors. Able's insurance policy report for 2017 was admitted into evidence and clearly stated that Able did not use any subcontractors. And Able's contract with one of its clients, Melville Candy, (also admitted into evidence) stated that "[a]ll workers are employed by [Able]" and that Able would handle all federal and state payroll taxes. Further, Giang never filed any 1099 forms with the IRS (as required for reporting payments to subcontractors), even though her accountant testified that he had discussed 1099 forms with Giang. And, critically, though both Giang and her daughter testified at some length about Able's business operations, neither testified or even suggested that Able used subcontractors in addition to (or instead of) employees. Indeed, Giang testified that her accountant had unilaterally made

the decision to categorize the payments as subcontractor wages on Giang's tax return, which Giang did not "know how to read."

So what Giang characterizes as "conflicting evidence" is better described as one solitary tax form that weakly supports her theory against a slew of evidence that contravenes it.  See Angiulo, 897 F.2d at 1207 ("There was little or no evidentiary grounds to warrant instructing the jury on the [defense] theory."). Giang had the burden of identifying sufficient evidence from her trial that warranted a jury instruction on her subcontractor theory of defense.  See Ramos-Paulino, 488 F.3d at 462.  Because she failed to meet that burden, the district court did not err by declining to instruct the jury on subcontractor tax obligations.

**b. Good Faith**

Next, Giang attacks the district court's instructions on willfulness and good faith.  The district court instructed the jury that, for the charges of failure to collect or pay over taxes and mail fraud, "willfully" meant "to participate voluntarily with the specific intent to do something that the law forbids.  Because willfulness is an essential element of the crimes, actions taken in good faith by a defendant amount to a complete defense."  The court further instructed: "a defendant [cannot] act in good faith, even though she holds a certain opinion or belief, if she also acted with the purpose of deceiving others."

Giang objected to this additional language, arguing it conflated general intent to deceive with the heightened standard of specific intent required for tax crimes. The district court overruled the objection, stating that it was a correct statement of First Circuit law and appropriately included on that basis. Giang contends that this formulation lowered the government's burden of proof, because it shifted the jury's focus from "Giang's state of mind with respect to her duties" to "whether she tried to deceive anyone." Giang argues that the instruction did not require this deceit to be tied to the crime.

Violations of the "highly technical statutes" that govern tax law bear "an exception to the traditional rule that ignorance of the law is no excuse." Bryan v. United States, 524 U.S. 184, 194-96 (1998) (citation modified). Instead, the government must prove that a defendant "willfully" violated tax laws: that she knew of a legal duty and intentionally violated it. Cheek v. United States, 498 U.S. 192, 201 (1991).

Here, Giang says, the court's instructions would have allowed the jury to convict on a finding of something less than willfulness. This is because the instructions essentially defined a lack of good faith as synonymous with willfulness, and then further permitted the jury to find a lack of good faith if it found Giang had deceived anyone, even if that deceit was unrelated to the alleged crime.

The government appears not to dispute that the district court's instruction might have left the jury with the impression that, if it found Giang had deceived anyone, it could not find she had acted in good faith -- even if that deceit was unconnected to her mental status about the alleged crime. But, it says, the instruction did not equate "absence of good faith" with "willfulness." That is, while a lack of good faith was a necessary condition for a finding of willfulness, the instructions did not say that such a lack was, standing alone, sufficient to find willfulness.

Although the government is strictly correct that the instruction did not equate deceptive conduct with a lack of willfulness, jurors do not "pars[e] instructions for subtle shades of meaning in the same way that lawyers might." Boyde v. California, 494 U.S. 370, 381 (1990). So while the question is close, we think that the instructions, as given, were in error. The central point of Giang's defense was that she did not understand the tax laws to which she was subject and so her violations were unintentional. That defense made the "willfulness" element of the instructions especially important. As Giang hypothesizes, perhaps the jury might have focused on the idea that Giang deceived someone for reasons unconnected to the crime, such as not "tell[ing] her daughter about her cash payments to workers because she knew her daughter did not like her carrying

large sums of money," or concealing her payments from a Rockland Trust bank teller "because she felt uncomfortable sharing personal information about her workers."

But not every error requires reversal. Because it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," we decline to vacate Giang's conviction. McLellan, 959 F.3d at 466 (citation modified).

The instruction must be considered in the context of the entire trial record. United States v. Paredes-Rodriguez, 160 F.3d 49, 53 (1st Cir. 1998). The trial record reveals that Giang's hypothetical arguments about deceiving her daughter or bank employees for innocent reasons were just that: hypothetical. And beyond that, the government's witnesses did not try to paint Giang as a liar or fraudster in some general sense, nor did they raise instances of deceit unconnected to the crime that might have confused the jury.

Rather, the only allegedly deceitful conduct described at trial -- Giang's misleading of bank tellers, her daughter, and Travelers -- all tied directly into the offense itself, and thus Giang's state of mind with respect to her tax duties.[8] Besides the trial evidence, the parties' closing statements about deceit

_____

[8] For example, the only reasons Giang gave for not telling her daughter about paying workers in cash and checks outside of Able's accounting system were that it was not "necessary" to do so, and because it was "not her [daughter's] business."

also focused entirely on Giang's alleged deceit and state of mind in connection with the specific charged crimes, not Giang's possible deceit with respect to someone or something else unrelated to the offense that might have led the jury astray. Indeed, Giang's closing argument, at least with respect to deceit, was not that she lied to her daughter or bank employees for innocent reasons unconnected to the crime, but rather that she did not lie at all. So, we do not think that "the record contains evidence that could rationally lead to a contrary finding" absent the error. United States v. Baldyga, 233 F.3d 674, 682 (1st Cir. 2000) (citation modified).

Besides this, the evidence that Giang acted willfully was sufficiently strong that we think this single instruction could not have made the difference between a guilty verdict and an acquittal, particularly given that there was no evidence of deceit outside of the direct evidence related to the crime. See Davignon v. Clemmey, 322 F.3d 1, 9-10 (1st Cir. 2003) (explaining that a putatively erroneous instruction was not harmful "given that it almost certainly did not affect the verdict"). Giang's pattern of structured withdrawals strongly suggests that she sought to conceal her cash-payment practices from the authorities, and Giang offered no reasonable explanation for this structuring conduct. Further, Giang offered no compelling reason for concealing her significant outside-the-payroll-system cash payments from her

daughter (who managed payroll and Able's accounting system). And her argument that she paid her workers in cash because they lacked bank accounts and could not cash checks falls flat in the face of evidence that at least some of the employees to whom she made off-the-books cash payments were also paid by check. Accordingly, we decline to reverse Giang's mail fraud or failure to pay tax convictions because of instructional error on good faith.[9]

## C. Sufficiency of the Mail Fraud Evidence

Finally, we consider Giang's argument that the evidence was insufficient to support her mail fraud conviction. We focus on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998) (citation modified). A defendant who does not preserve a sufficiency challenge -- as Giang concedes she failed to do -- must convince us that her conviction "would result in clear and gross injustice." United States v. Falcón-Nieves, 79 F.4th

---

[9] We have explained that the willfulness standard set in Cheek does not apply to mail fraud. United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991). Because we conclude that any error was harmless even under the higher Cheek standard, we do not reach the government's separate argument that there was no instructional error with respect to the mail fraud count because of the differing standards.

116, 124 (1st Cir. 2023) (citation modified). This is "a particularly exacting variant of plain error review." Id.

To support a conviction for mail fraud under 18 U.S.C. § 1341, the government must prove "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail communications in furtherance of that scheme." United States v. Tavares, 844 F.3d 46, 58 (1st Cir. 2016) (citation modified). Giang challenges the sufficiency of the evidence to prove only the last element.

In meeting this final use-of-the-mail element, the government need not prove that the defendant has sent any mail herself, but must prove only that the defendant has "(1) cause[d] the use of the mails, which includes reasonably foreseeable mailings, and (2) use[d] the mails for the purpose, or in furtherance, of executing the scheme to defraud." United States v. Hebshie, 549 F.3d 30, 36 (1st Cir. 2008) (emphasis omitted). Because this latter "in furtherance" element "is to be broadly read and applied," the mailing need only be "incident to an essential part of the scheme" or "a step in the plot," and no "but-for" link between the mailing and the scheme is required. Id. (citation modified).

Giang says the evidence was insufficient to prove (1) that the 2018 premium adjustment letter -- which served as the

basis for this count -- was ever mailed, and (2) even if it were mailed, that Giang could have reasonably foreseen that the letter would be mailed. The government responds that, when Giang submitted false payroll information to Travelers, she should have foreseen that it would trigger the physical mailing of a refund notice from Travelers, given her past dealings with the insurer.

At trial, the government presented evidence that Travelers physically mailed that 2018 premium adjustment letter to Giang in Massachusetts from either Georgia or Connecticut. The government's primary witness was a Travelers investigator who testified that adjustment letters were printed and mailed from Travelers' printing office in Norcross, Georgia. The 2018 letter itself, which was admitted at trial, identified a Connecticut mailing address for Travelers. The testifying investigator had no direct involvement with Giang's policy until 2020 and lacked firsthand knowledge about the letter's mailing in 2018. Even so, he testified that premium adjustment letters like the one at issue were, as a matter of practice, mailed in hard copy to insureds following the audit.

Giang attacks the investigator's testimony as inherently unreliable because it "contradicted the online invitation letter which said the premium adjustment notice would be available electronically." But, of course, that the notice might also have been available online does not preclude its being mailed. Nor

does the investigator's testimony that letters were mailed from Travelers' Georgia printing office conflict, as Giang suggests it does, with the fact that the letter itself identified a Connecticut P.O. box as Travelers' mailing address. So, Giang offers no real indication that the investigator's testimony was unreliable. Armed with these facts, a reasonable jury could readily have concluded that the premium adjustment notice was sent by mail.

As for foreseeability, we have explained that mailings are reasonably foreseeable when they are part of "the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies." United States v. Morrow, 39 F.3d 1228, 1237 (1st Cir. 1994). And a defendant need not expect a particular mailing. Rather, it is "simply the use of the mails" at all that must be foreseeable. United States v. Pimental, 380 F.3d 575, 589 (1st Cir. 2004) (citation modified); see also United States v. Bruckman, 874 F.2d 57, 60 (1st Cir. 1989) (mailing requirement met "so long as some use of the mails was reasonably to be anticipated in the course of the scheme").

Giang says that there was no such criss-cross here; she dealt with Travelers electronically. But the investigator testified that, at the time of the 2018 mailing, Giang would have been sent a premium adjustment notice by mail at the end of each

year she held a policy -- that is, in 2015, 2016, and 2017.[10]  So while there may not have been a back-and-forth -- which, in any event, we have never held to be required -- there was at least a pattern of mailings over several years from which a reasonable jury could draw the conclusion that Giang could have expected Travelers to mail a notice in 2018, too.

Given the demanding standard of review Giang faces, we are not persuaded by her sufficiency arguments and find that there was no plain error here.

### IV.  CONCLUSION

For all the foregoing reasons, Giang's convictions are **AFFIRMED**.

---

[10] Giang points out that the investigator said only that prior notices were "sent" to Giang, not "mailed."  While true, his testimony about the prior notices must be read along with his other testimony that such premium adjustment notices "are sent by regular mail."